**Bernard A. SCHLIFKE and Harvey Kallick, d/b/a K & S Investments Co., a partnership, Plaintiffs–Appellants,**

v.

**SEAFIRST CORP. and Seattle–First National Bank, Defendants–Appellees.**

No. 87–2898.

United States Court of Appeals, Seventh Circuit.

Argued May 23, 1988.

Decided Jan. 19, 1989.

dence to be presented prior to trial).

Philip S. Nathanson, Nathanson & Wray, Chicago, Ill., for plaintiffs-appellants.

Bruce D. Lamka, Davis Wright & Jones, Seattle, Wash., for defendants-appellees.

Before CUDAHY, RIPPLE, and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Plaintiffs-appellants Bernard A. Schlifke and Harvey Kallick commenced this securities fraud suit against several defendants, including Seattle–First National Bank,[1] alleging that the defendants violated the federal securities laws in connection with the sale of limited partnership interests in an oil and gas exploration program.[2] Plaintiffs advanced multiple theories of primary and secondary liability under section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77$l$(2); section 10(b) of the Securities Exchange Act of 1934 ("SEA"), 15 U.S.C. § 78j(b) and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5; section 17(a) of the SEA, 15 U.S.C. § 77q(a); and section 20(a) of the SEA, 15 U.S.C. § 78t(a). The district court granted summary judgment in favor of the defendants on all counts. We affirm.

## I.

A summary judgment motion is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing a summary judgment, we must view the record and the inferences drawn from it in the light most favorable to the non-moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Rodeo v. Gillman,* 787

1. Originally, the plaintiffs sued two sets of defendants, ENI Exploration Company and related entities, and Seafirst Corporation and its wholly-owned subsidiary, Seattle–First National Bank. Pending resolution of this appeal of a summary judgment in favor of Seafirst Corporation and Seattle–First National Bank (collective-ly referred to as the "Bank"), plaintiffs' action against the ENI defendants was voluntarily dismissed without prejudice.

2. Plaintiffs raised pendent state law claims below, which were dismissed without prejudice and are not before this court.

F.2d 1175, 1177 (7th Cir.1986) (citations omitted). However, where the non-moving party will bear the burden of proof on an issue at trial, Rule 56(e) requires that the nonmovant go beyond the pleadings and affirmatively demonstrate, by specific factual showings, that there is a genuine issue of material fact requiring trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). With these principles in mind, we shall examine the facts of this case.

In 1981, ENI Corporation ("ENI") sold limited partnership interests in ENI Exploration Program 1981–III ("ENI 1981–III"), a limited partnership organized to engage in oil and gas exploration and managed by ENI Exploration Company ("ENIX"). ENI obtained financing for the 1981–III program from Seattle–First National Bank (the "Bank"). Under the terms of the executed Loan Agreement, borrowings by ENI 1981–III were to be secured by letters of credit from investors, equivalent to 116% of each investor's financial commitment to the program. The Bank established certain criteria for banks issuing letters of credit to ensure that they were financially secure. By arranging these letters of credit to secure the Bank's loan to the exploration program and by assuming a proportionate share of the indebtedness pursuant to an Assumption Agreement, investors were afforded a tax deduction without any initial cash outlay.

Before investing in ENI 1981–III, Schlifke, a banking lawyer, and Kallick, a certified public accountant, received a Prospectus and Subscription Supplement, the latter of which included the following loan documents prepared by the Bank: a Loan Agreement between ENI 1981–III and the Bank; a Promissory Note from ENI 1981–III to the Bank; a form Irrevocable Letter of Credit; and an Assumption Agreement pursuant to which the individual investors agreed to assume a proportionate share of the ENI 1981–III indebtedness to the Bank in the event that the letters of credit were not honored. ENI sales personnel were responsible for distributing these documents and soliciting prospective investors. In the solicitation of Schlifke and Kallick, ENI sales personnel allegedly made several fraudulent representations which induced them to purchase three units of a limited partnership interest at $50,000 each. After ENI informed the plaintiffs that their tendered letter of credit was rejected for failure to comply with the Bank's requirements for issuing banks, the plaintiffs eventually submitted an acceptable irrevocable letter of credit in the amount of $174,000, naming the Bank as beneficiary. In 1983, due to its failure to produce sufficient oil and gas revenues, ENI 1981–III defaulted on its loan, and the Bank made presentment and demand for payment of the letters of credit securing the loan.

Plaintiffs filed suit in November of 1983 against two sets of defendants—ENI and related entities, and the Bank—claiming that their investment had been fraudulently procured in violation of federal and state securities laws. The complaint alleged that the defendants failed to disclose material facts and made material false representations in connection with the solicitation of the plaintiffs to purchase interests in the ENI 1981–III limited partnership. During discovery, plaintiffs adduced facts which, in their view, established the Bank's culpability. For example, they learned that two months prior to their investment, the Bank had increased its line of credit to ENIX from $9.5 to $46.5 million. This increase was approved on behalf of the Bank by its chief executive officer, William Jenkins, who at the same time had $300,000 of his own money invested in earlier ENI oil and gas limited partnerships. In addition, discovery revealed that the Bank had extended substantial personal loans to Victor Alhadeff, the principal operating officer of ENIX.

In response to the Bank's motion for summary judgment, plaintiffs posited a number of theories for imposing liability on the Bank. These are all predicated essen-

tially upon the same facts involving the Bank's purported misrepresentations and omissions in soliciting the plaintiff-investors. These theories include: (1) primary liability as a "seller" of securities under section 12(2) of the Securities Act of 1933; (2) secondary liability as an aider and abettor of a section 12(2) violator; (3) primary liability under section 17(a) of the SEA; (4) primary or, alternatively, secondary liability under section 10(b) of the SEA and the concomitant SEC Rule 10b–5;[3] and (5) "controlling person" liability under section 20(a) of the SEA. The district court found that nothing in the plaintiffs' complaint demonstrated that the Bank's participation in the ENI 1981–III program amounted to anything more than a customary financing transaction. *See Schlifke v. Seafirst Corp.,* No. 83 C 8591, mem. op. at 4 (N.D. Ill. Jan. 26, 1987) *("Schlifke I")* [1987 WL 4718]. Accordingly, the court found no factual conflicts which could result in recovery under any theory. We agree and therefore affirm the grant of summary judgment in favor of the Bank.

## II.

A. *Section 12(2) Liability*

In applying section 12(2) of the Securities Act of 1933,[4] this court has previously stated that "the statute explicitly requires privity between plaintiff-purchaser and defendant-seller." *Sanders v. John Nuveen &*

3. With respect to their 10b–5 claim, plaintiffs opposed the Bank's summary judgment motion by relying primarily on an aiding and abetting theory. Accordingly, the district court disposed of the claim solely on this theory. In their briefs on appeal, however, the parties have argued both primary and secondary liability and we shall therefore address each theory separately.

4. Section 12(2) provides:
   Any person who—
   (2) offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), ... shall be liable to the person purchasing such security from him....

*Co., Inc.,* 619 F.2d 1222, 1226 (7th Cir. 1980), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981). *See also Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 494 (7th Cir.1986) (law firm and accounting firm which rendered services in connection with the sale of securities by a corporation cannot be § 12(2) sellers). The Third Circuit has also espoused this view. *See Collins v. Signetics Corp.,* 605 F.2d 110, 113 (3rd Cir.1979) ("[Section 12(2)] is designed as a vehicle for a purchaser to claim against his immediate seller. Any broader interpretation would not only torture the plain meaning of the statutory language but would frustrate the statutory scheme...."). Notwithstanding contentions that the language in *Sanders* is non-binding dictum, the district courts of this circuit have quite consistently construed *Sanders* as persuasive authority for "requir[ing] that the defendant be one who could have passed title to the security in question." *Steinberg v. Illinois Co.,* 659 F.Supp. 58, 60 (N.D.Ill.1987) (collecting cases); *Beck v. Cantor Fitzgerald & Co.,* 621 F.Supp. 1547, 1560–62 (N.D.Ill. 1985); *Kennedy v. Nicastro,* 503 F.Supp. 1116, 1118 (N.D.Ill.1980).[5] The court below apparently applied a strict privity test finding that the plaintiffs had failed to establish that the Bank was an "immediate seller" or that a "purchaser-seller relationship" existed between the parties. *See Schlifke I,* mem. op. at 5.

15 U.S.C. § 77*l*(2).

5. In some isolated cases, however, the district courts have jettisoned the strict privity requirement. For example, in *Excalibur Oil, Inc. v. Sullivan,* 616 F.Supp. 458 (N.D.Ill.1985), Judge Shadur rejected the strict privity test, holding that an attorney was a "seller" under section 12(2) even though he had no title to the securities and hence could not pass title to a purchaser. Similarly, in *Ambling v. Blackstone Cattle Co.,* 658 F.Supp. 1459 (N.D.Ill.1987), Judge Bua expressed reservation over whether *Sanders* requires strict privity, but declined to decide the issue beyond holding that a "'seller,' for purposes of determining § 12(2) liability, is not limited to one who actually transfers title but extends to those participants who represent the transferor by actively soliciting the sale of the transferor's securities," *id.* at 1465–66, but not those who merely draft a misleading prospectus. *Id.*

The language of *Sanders*, although dictum, is this court's only clear interpretation of who may be a "seller" under section 12(2). Other circuits, however, have liberalized the privity requirement and have variously crafted tests for imposing liability. For example, the Fifth and Sixth Circuits have held that section 12(2) sellers include those persons who "proximately caused" a securities transaction. *See Davis v. AVCO Financial Services, Inc.*, 739 F.2d 1057, 1065 (6th Cir.1984), *cert. denied*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 381 (1985) ("But for the presence of the defendant ... in the negotiations preceding the sale, could the sale have been consummated?" (quoting *Lennerth v. Mendenhall*, 234 F.Supp. 59 (N.D.Ohio 1964))); *Croy v. Campbell*, 624 F.2d 709, 713 (5th Cir.1980). A different Fifth Circuit panel, as well as the Fourth, Eighth, Ninth and Eleventh Circuits, have embraced a somewhat more refined version—the "substantial factor" test, which imposes section 12(2) liability on those whose participation is a substantial factor in causing the securities sale to take place. *See Jett v. Sunderman*, 840 F.2d 1487, 1491 (9th Cir.1988) (defining section 12(2) seller as a participant whose "actions were both necessary to and a 'substantial factor' in bringing about the sales transaction" (citing *S.E.C. v. Murphy*, 626 F.2d 633, 649–50 (9th Cir.1980))); *Adalman v. Baker, Watts & Co.*, 807 F.2d 359 (4th Cir.1986); *Foster v. Jesup & Lamont Secs. Co.*, 759 F.2d 838, 844 (11th Cir.1985); *Stokes v. Lokken*, 644 F.2d 779, 785 (8th Cir.1981); *Pharo v. Smith*, 621 F.2d 656, 667 (5th Cir.1980). Still a different rule has been prescribed by the Second Circuit, recognizing section 12(2) liability for "nonselling collateral participants" who possess the requisite scienter. *See Wilson v. Ruffa & Hanover, P.C.*, 844 F.2d 81, 85 (2d Cir.1988).

In the analogous context of section 12(1) liability, the Supreme Court has recently resolved the conflict among the circuits in defining "seller." In *Pinter v. Dahl*, — U.S. ——, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), the Court rejected the "substantial factor" test for assessing section 12(1) liability in connection with the illegal sale of unregistered securities. The Court maintained that

> [t]here is no support in the statutory language or legislative history for expansion of § 12(1) primary liability beyond persons who pass title and persons who "offer," including those who "solicit" offers. Indeed, § 12's failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants collateral to the offer or sale.

*Id.* 108 S.Ct. at 2080.[6] The Court, however, refused to narrowly limit the class of defendants potentially liable under section 12(1) merely to persons who pass title, *id.* at 2076, but instead interpreted the statute to encompass brokers and others who "successfully solicit[ ] the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner." *Id.* at 2079. Although the Court noted that the "offers or sells" language governing section 12(1) also governs section 12(2) and that most courts and commentators define the defendant class similarly under both provisions, the case did not present—and the Court expressly declined to decide—the scope of a statutory seller for purposes of section 12(2). *See id.* at 2076 n. 20.

The language in *Pinter v. Dahl*, coupled with prevailing federal case law in other circuits, seems to undermine the continuing viability of the strict privity concept under section 12(2). *See generally* O'Hara, *Erosion of the Strict Privity Requirement in Section 12(2) of the Securities Act of 1933*, 31 UCLA L.Rev. 921 (1984). We need not, however, pursue this question today since the Bank in this case is not a statutory "seller" either under the *Pinter v. Dahl* definition or under the more liberal "substantial factor" or "proximate cause" tests which the plaintiffs urge us to adopt. The Bank did not actively participate in the solicitation of investors, nor did it partic-

---

**6.** For similar reasons, the Court also rejected the theory that persons who merely "participate in soliciting the purchase" may qualify as statutory sellers. *See id.* 108 S.Ct. at 2081 n. 27.

ipate in the preparation of the Prospectus (other than in drafting the loan documents that ENI elected to attach to the Subscription Supplement). The Bank had no contact with ENI sales personnel, nor did it otherwise actively promote the investment program. Even viewing the record in the light most favorable to the plaintiffs, the Bank's activities do not approximate those activities giving rise to section 12(2) liability under the liberal tests applied in other circuits. *See, e.g., Davis v. AVCO Financial Services, Inc.*, 739 F.2d 1057 (section 12(2) liability imposed on finance company whose manager attended and made speeches at promotional meetings, represented that scheme was a good quality investment, furnished loan applications and generally contributed to the selling momentum).

■ Alternatively, the plaintiff-investors seek to impose section 12(2) liability on the Bank as an immediate seller of a security in the form of an "investment contract." This convoluted argument suggests that the entire transaction between the plaintiffs, the Bank and ENI constitutes an investment contract. As partners under this contract, the plaintiffs and the Bank are purportedly in privity of contract as evidenced by the Assumption Agreement. In view of this contractual relationship, according to plaintiffs' cryptic theory, the Bank violated its section 12(2) duty to disclose all material facts.

In the seminal case of *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court defined "investment contract" for purposes of the Securities Act as

> a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. . . .

*Id.* at 298–99, 66 S.Ct. at 1103. Plaintiffs concede that "in the normal course of business, merely lending money to a securities program and obtaining interest on the indebtedness would not qualify a lender as an investor." Brief of Plaintiffs–Appellants at 28. Yet plaintiffs attempt to dis-

tinguish this case as exceptional because the Bank's "investment, i.e., its financing of ENI 1981–III, on the heels of its $46.5 million loan to the general partner, ENIX, was for the purpose of not only receiving interest and fees on the co-investors' letters of credit, but also profit through repayment of the interest and principal on *non*-ENI 1981–III indebtedness owed by ENIX and Alhadeff." *Id.* at 29 (emphasis added). We reject plaintiffs' far-fetched investment contract theory because it clearly fails the *Howey* test. Specifically, plaintiffs have not demonstrated the fundamental "investment" or "expectation of profit" elements of *Howey*. The Bank's financing arrangement, as we view it, was not an "investment" at all, but a mere "commercial" loan transaction not implicating the federal securities laws. *Cf. Hunssinger v. Rockford Business Credits, Inc.*, 745 F.2d 484, 488 (7th Cir.1984). In *Hunssinger*, this court pointed out that "if a bank or other commercial lender makes a loan to finance business transactions and takes a note in return, the parties could not be said to have participated in a securities transaction." *Id.* at 492–93. *See also Arthur Young & Co. v. Reves*, 856 F.2d 52, 55 (8th Cir.1988). Although the Bank

> necessarily became involved in the transaction . . . to the extent necessary to fully document and protect its loans and collateral, there is no evidence that [it] thereby intended to be making an investment or that it took any steps to induce any investment by [the borrower] with [the seller].

*South Carolina Nat'l Bank v. Darmstadter*, 622 F.Supp. 226, 231 (D.S.C.1985), *aff'd*, 813 F.2d 403 (4th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed. 2d 1000 (1987).

Thus, we agree with the district court that the Bank was acting merely as a commercial lender when it extended a loan to ENI 1981–III at a fixed rate of interest. Based on this characterization, Judge Kocoras also properly found that plaintiffs had failed to satisfy *Howey*'s "expectation of profit" element, because "profit" in this sense does not include fixed interest pay-

ments. *See Hunnsinger,* 745 F.2d at 490. Rather, "profit" in this context generally means "either capital appreciation resulting from the development of the initial investment ... or participation in earnings resulting from the use of the investor's funds...." *United Housing Found., Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975); *see also Arthur Young & Co. v. Reves,* 856 F.2d 52, 54–55. The plaintiffs argue that the Bank stood to "profit" from the potential success of ENI 1981–III since, if ENI 1981–III succeeded, ENIX and Victor Alhadeff would be more capable of making principal and interest payments on prior loans. This contention is unavailing because the Bank was already entitled to repayment of these prior loans. Thus, "[t]his is not the type of 'profit' contemplated in the Securities Act of 1933 and in the subsequent cases interpreting that Act." *Schlifke v. Seafirst Corp.,* No. 83 C 8591, mem. op. at 6–7 (N.D.Ill. Sept. 21, 1987) [1987 WL 17483] (denying reconsideration of summary judgment) ("*Schlifke II*"). Absent a showing of the *Howey* elements, the plaintiffs' contrived "investment contract" theory of liability collapses.

■ The final theory these oil and gas investors attempt to extract from an already depleted section 12(2) derives from the aiding and abetting doctrine. Because this circuit has not previously recognized aiding and abetting liability in the 12(2) context, plaintiffs request that the court declare a new implied private right of action under this theory. But notions of aiding and abetting liability would be inconsistent with the intent and language of the statutory provision which expressly limits to offerors and sellers the categories of persons who may be sued. Accordingly, many courts have refused to circumvent the section 12(2) seller requirement by implying some sort of secondary liability. *See, e.g., Laven v. Flanagan,* 695 F.Supp. 800, 813 (D.N.J.1988) (collecting cases); *Frymire v. Peat, Marwick, Mitchell & Co.,* 657 F.Supp. 889 (N.D.Ill.1987); *Hokama v. E.F. Hutton & Co., Inc.,* 566 F.Supp. 636 (C.D.Cal.1983); *cf. Admiralty Fund v. Jones,* 677 F.2d 1289, 1294–95 n. 4 (9th Cir.1982) (declining to decide issue, but noting "doubtful nature" of § 12(2) aiding and abetting liability); *Collins v. Signetics Corp.,* 605 F.2d 110, 113–14 (3rd Cir.1979) (leaving the question of § 12(2) aiding and abetting liability open). If aiding and abetting claims were cognizable, it would, in effect, eviscerate the various "substantial factor," "proximate cause" and "privity" tests adopted by the circuit courts for imposing primary liability. *See In re Diasonics Secs. Litig.,* 599 F.Supp. 447, 458 (N.D. Calif.1984). Even the Second Circuit, which has expressly acknowledged section 12(2) aiding and abetting liability, limits it to defendants who act with scienter. *See Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 756 (2d Cir.1986). Therefore, in the absence of a showing that the Bank acted with scienter, we see no reason at this time to imply a right of action for aiding and abetting under section 12(2).

## B. *Liability Under Section 17(a)*

■ We are also disinclined to accept the plaintiffs' suggestion that we imply a private right of action under section 17(a) of the Securities Act of 1933. 15 U.S.C. § 77q(a).[7] Although we held in *Daniel v. Teamsters,* 561 F.2d 1223, 1244–46 (7th Cir. 1977), *rev'd on other grounds,* 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), that such a right of action exists, the Su-

---

7. Section 17(a) provides:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

preme Court reversed our judgment and expressly refused to decide the section 17(a) issue. 439 U.S. at 557 n. 9, 99 S.Ct. at 795 n. 9. *See Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 530–31 (7th Cir.1985). A decisive majority of recent authorities have refused to imply a right of action under section 17(a). *See Currie v. Cayman Resources Corp.*, 835 F.2d 780 (11th Cir.1988); *In re Wash. Public Power Supply System Secs. Litig.*, 823 F.2d 1349 (9th Cir.1987) (en banc); *Deviries v. Prudential–Bache Secs., Inc.*, 805 F.2d 326, 328 (8th Cir.1986); *Landry v. All American Assurance Co.*, 688 F.2d 381 (5th Cir.1982). We believe this authority should prevail. But, even if an implied private right of action were available under section 17(a), the plaintiffs could not state a claim in this case because "this section and Rule 10b–5 'track' each other closely, [and] the lack of a 10b–5 cause of action would preclude section 17(a) relief also." *Ray v. Karris*, 780 F.2d 636, 641 n. 3 (7th Cir. 1985); *Bastion v. Petren Resources Corp.*, 681 F.Supp. 530, 536–37 (N.D.Ill.1988) (citing *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 530–31). *See infra* for discussion of Rule 10b–5.

C. *Primary Liability Under Section 10(b) and Rule 10b–5*

In order to state a claim under Rule 10b–5, 17 C.F.R. § 240.10b–5,[8] the plaintiffs must demonstrate that the Bank: (1) made an untrue statement of material fact or omitted a material fact that rendered the statements made misleading, (2) in connection with a securities transaction, (3) with the intent to mislead, and (4) which caused plaintiff's loss. *Cf. Rowe v. Maremont Corp.*, 650 F.Supp. 1091, 1104 (N.D.Ill. 1986), *aff'd*, 850 F.2d 1226 (7th Cir.1988).

Plaintiffs essentially allege two affirmative misrepresentations by the Bank. First, they contend that the loan documents represented that the Bank was the sole financier of the partnership loan, when in fact the Bank had sought participation from other banks. Second, they allege that the loan documents represented that the partnership was indebted to the Bank for the loan, when in fact the Bank looked solely to the individual investors' letters of credit to repay the loan.

In addition, affording the plaintiffs the broadest reading of the record, there are seven alleged material omissions: (1) the Bank did not disclose its intent to look exclusively to the letters of credit for repayment of the loan, thus rendering the Bank's representations about the partnership loan agreement misleading; (2) the Bank did not disclose that it had drawn upon the letters of credit in all prior ENIX partnerships; (3) the Bank did not disclose that it was not providing 100% of the financing (but was seeking participants); (4) the Bank did not disclose that it had recently extended a $46.5 million line of credit to ENIX, thus indicating its extensive involvement with the partnership; (5) the Bank did not disclose that its chief executive officer (who approved the $46.5 million line of credit) had $300,000 personally invested in earlier ENI programs; (6) the Bank did not disclose that the oil reserves in the investment program were collateral for prior loans; (7) the Bank did not disclose that it had loaned several million dollars personally to Victor Alhadeff (the principal operating officer of ENIX), who supposedly depended on the perpetuation of ENI to repay his loans.

Regarding the two alleged affirmative misrepresentations, plaintiffs' charges are

---

**8.** Rule 10b–5, which was promulgated under section 10(b) of the SEA, 15 U.S.C. § 78j(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

  (a) To employ any device, scheme, or artifice to defraud,

  (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

  (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

unfounded. Paragraph 9.4 of the Loan Agreement explicitly states that other lenders will participate,[9] and nothing in the loan documents indicates otherwise. Likewise, both the Loan Agreement and the Assumption Agreement unequivocally state that the Bank is entitled to collect on the letters of credit without first proceeding against the partnership.[10] To the extent that there might have been any oral misrepresentations to the contrary by ENIX sales personnel or others, the written disclosures control. *See Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322 (7th Cir.1988). Hence, these written provisions dispose of the two alleged affirmative misrepresentations as well as alleged omissions (1) and (3) pertaining to the questions of looking to the letters of credit first and participation by other banks in the financing.

▆▆▆▆ Further, liability does not attach to the other enumerated alleged omissions because, with respect to them, there was no duty to disclose. *See Jett v. Sunderman*, 840 F.2d 1487 (9th Cir.1988) (citing *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980)). The express language of 10b-5 only proscribes omissions that render affirmative statements misleading; thus, incomplete disclosures, or "half-truths," implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements. *See Rowe v. Maremont Corp.*, 650 F.Supp. 1091, 1105 (N.D. Ill.1986), *aff'd*, 850 F.2d 1226 (7th Cir.1988) (citations omitted). In addition, even absent any misleading statements, an independent duty to disclose material facts may be triggered by a fiduciary-type relationship. *See Chiarella*, 445 U.S. at 232, 235, 100 S.Ct. at 1116, 1118. *See generally* R. Jennings & H. Marsh, *Securities Regulation: Cases and Materials* 1043 (6th ed. 1987).

Here, the plaintiffs claim that the alleged misleading loan documents describing the structure and nature of the securities transaction created a duty to disclose the other material facts regarding the transaction. *See* Reply Brief of Plaintiffs–Appel-

---

9. Paragraph 9.4 states in relevant part: "The Borrower understands that other lenders will participate with the Bank in making the Loan and such other lenders shall have the same rights as the Bank hereunder, as if such lenders were parties to this Loan Agreement." App. to Plaintiffs–Appellants' Brief at 76.

10. As the district court properly found, several provisions in the Loan Agreement make this eminently clear:

¶ 3.1 "The holder of the Note shall be entitled to payments on the Note from the Borrower *or* by making demand upon the banks issuing the Letters of Credit and upon the assuming limited partners...." (emphasis added).

¶ 3.3 *"Payment of Note at Maturity.* The holder of the Note shall be entitled to payment of the Note at maturity ... by making demand upon the banks issuing the Letters of Credit. If such demands under the Letter of Credit are not satisfied by such issuing banks within three (3) days following the maturity date of the Note, the holder of the Note may demand payment of the Note directly from the Borrower's limited partners pursuant to the Assumption Agreements and pursuant to the security interest and assignment granted under Section 3.5."

¶ 3.5 *"Security Interest in and Assignment of Limited Partners' Obligations.* To secure the payment and performance of all of Borrow-

er's obligations hereunder and under the Note, the Borrower hereby grants to Bank a security interest in and assigns to Bank all of Borrower's rights to receive from Borrower's limited partners who have provided a Letter of Credit payment of such limited partners' capital contributions to Borrower under the Subscription Agreements between Borrower and such limited partners...."

¶ 7 In the event of any default, the holder of the Note is entitled, *inter alia*, to "proceed with ... the enforcement and realization upon the Letters of Credit...."

*See* App. to Plaintiffs–Appellants' Brief at 70–75. In addition, the Assumption Agreement was explicit on this point:

"This Assumption Agreement shall terminate when the full amount of the Letter of Credit provided by the undersigned is paid to the beneficiary of the Letter of Credit." Further, "[t]he Bank shall not be required to exhaust its recourse or to take any action against the Partnership...."

*See id.* at 82. Finally (to dispel any lingering doubts), the Prospectus further fortified the point:

"Limited Partners should arrange their personal finances so as to satisfy their obligations under their Letter of Credit and their assumption and should not expect Partnership revenues to provide sufficient cash flow to meet such obligations."

Prospectus at 7.

lants at 17. They contend that the loan agreement between the Bank and the partnership was a "phantom" agreement containing "illusory" obligations which falsely induced investors to believe that the Bank had a legitimate expectation of revenues from a propitious investment program. *Id.* at 17–18. We do not read the agreement so cynically. In fact, a fair reading of the loan documents does not indicate whether the Bank viewed the ENI exploration program as particularly attractive or unattractive for investment. Rather, the documents merely evidence the Bank's intent to protect itself. In addition, the plaintiffs do not explain how the litany of alleged omissions rendered any particular statements in the loan documents misleading thereby creating a duty to disclose.[11]

Nor do we find that the Bank had an independent duty to disclose arising from any quasi-fiduciary relationship with the investors. Plaintiffs suggest that their contractual relationship with the Bank, as evidenced by the Assumption Agreement, somehow fastened a duty to disclose on the Bank. The Supreme Court has held that parties to an impersonal market transaction owe no duty of disclosure absent a fiduciary or agency relationship, prior dealings or circumstances such that one party has placed trust and confidence in the other. *See Dirks v. SEC,* 463 U.S. 646, 653–54, 103 S.Ct. 3255, 3260–61, 77 L.Ed.2d 911 (1983); *Chiarella,* 445 U.S. at 232, 100 S.Ct. at 1116. In a factually similar case, *Jett v. Sunderman,* 840 F.2d 1487, the Ninth Circuit recently held that a bank that had made a loan to a limited partnership owed no duty of disclosure to the investors because

[the Bank] had no relationship with the investors prior to their making the investment ... [T]he bank had no communications with the investors and did not initiate the transaction or participate in it in any way that would induce the investors to rely on the bank to disclose information....

*Id.* at 1493. Further, we are unpersuaded by plaintiffs' position presented at oral argument that the existence of the Assumption Agreement warrants a finding of liability in this case. Execution of a contract in support of a bank loan, in itself, falls far short of creating a fiduciary relationship. *See Schneberger v. Wheeler,* 859 F.2d 1477, 1480 (11th Cir.1988) (Bank, which required each investor to sign acknowedgment agreement, had no duty to disclose precarious financial condition of oil and gas limited partnership); *Seattle–First Nat'l Bank v. Carlstedt,* 678 F.Supp. 1543, 1550 (W.D. Okl.1987) ("Under the federal securities laws, a lender owes no fiduciary or other duty to borrowers or other parties who invest in securities.") (collecting cases); *Cairns v. Renneisen, Renneisen & Redfield,* [1988] Fed.Sec.L.Rptr. (CCH) ¶ 93,626 at 97,839 (E.D.Pa. Aug. 6, 1987) [1987 WL 15427]; *D & G Enter. v. Continental Illinois Nat'l Bank,* 574 F.Supp. 263, 269 (N.D.Ill.1983); *Paskas v. Illini Federal Savings & Loan Ass'n,* 109 Ill.App.3d 24, 30–31, 64 Ill.Dec. 642, 647, 440 N.E.2d 194, 199 (5th Dist.1982). Nor does the fact that the Bank insisted that investors procure letters of credit from banks meeting certain criteria place the Bank in a quasi-fiduciary status. These are not the sort of prior dealings or circumstances creating a relationship of trust and confidence as envi-

---

**11.** Plaintiffs contend that the Bank should have disclosed its earlier loans to other ENI limited partnerships, to ENIX and to Victor Alhadeff. They maintain that such disclosure would have revealed that the Bank approved the loan to ENI 1981–III to recoup outstanding indebtedness, rather than as a reflection of its confidence in the success of the program. Plaintiffs neglect, however, to point to any specific statements by the Bank that are rendered misleading as a result of these omissions. The only misleading statement plaintiffs specifically refer to is the financial statement of ENIX included in the Prospectus of ENI 1981–III. They submit that the Bank's failure to disclose its extension of credit to ENIX rendered misleading the financial statement, which itself failed to reflect ENIX's increased obligations. But the financial statement was not a statement made by the Bank. Because the Bank was uninvolved in the preparation of ENIX's financial statement, its audit and its inclusion in the Prospectus, it cannot be primarily liable for failing to correct its contents. Whether the Bank might be secondarily liable is a separate question which will be discussed *infra.*

saged by *Chiarella*.[12] To be sure, the Bank had no direct dealings with the investors but merely drafted loan documents and established requirements to ensure its interests as a lender.

Plaintiffs' claim for primary 10b–5 liability also lacks the requisite "scienter" element. The Supreme Court has defined scienter in this context as the "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). This court has since held that the scienter requirement is satisfied by a showing of reckless conduct "defined as a highly unreasonable omission, ..., which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977) (citation omitted). *See also Rowe v. Maremont Corp.*, 850 F.2d 1226, 1238 (7th Cir.1988). The plaintiffs submit that the Bank's actual knowledge of the facts withheld amply establishes the necessary degree of scienter; however, this argument misconstrues the relevant inquiry. The question is not merely whether the Bank had knowledge of the undisclosed facts; rather, it is the *"danger of misleading buyers* [that] must be actually known or so obvious that any reasonable man would be legally bound as knowing." *Sundstrand*, 553 F.2d at 1045 (emphasis supplied). The record does not contain any such showing of scienter.

The Bank has also challenged the 10b–5 claim for failing to establish that the enumerated omissions were made "in connection with the sale of securities," *see Chemi-* cal *Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), and on the grounds of non-materiality. In view of the failure of the allegations on the bases we have noted above, we need not explore these additional arguments.

### D. *Aiding and Abetting Liability under Section 10(b) and Rule 10b–5*

■ This circuit has recognized a cause of action for aiding and abetting under section 10(b) and Rule 10b–5. *See LHLC Corp. v. Cluett, Peabody & Co., Inc.*, 842 F.2d 928 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988) (citing *Brennan v. Midwestern United Life Ins. Co.*, 259 F.Supp. 673 (N.D.Ind. 1966), *aff'd*, 417 F.2d 147 (7th Cir.1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970); *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490 (7th Cir.1986)). The Supreme Court has twice reserved decision on the issue, *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 379 n. 5, 103 S.Ct. 683, 685 n. 5, 74 L.Ed.2d 548 (1983); *Ernst & Ernst*, 425 U.S. at 191 n. 7, 96 S.Ct. at 1380 n. 7, thereby creating some ambiguity about the propriety of implying such a cause of action in the 10b–5 context. *See Cong. of Passion, Holy Cross v. Kidder Peabody & Co., Inc.*, 800 F.2d 177, 183 (7th Cir.1986). *See generally* Fischel, *Secondary Liability Under Section 10(b) of the Securities Act of 1934*, 69 Calif.L.Rev. 80 (1981). The Bank does not request that we reconsider our position nor is it necessary to do so because plaintiffs have, in any event, failed to adequately support their claim for 10b–5 liability under this theory.

Nor would we find such a duty if we were to consider the five determinative factors delineated by the Ninth Circuit: (1) the relationship of the parties; (2) their relative access to information; (3) the benefit that the defendant derives from the relationship; (4) the defendant's awareness that the plaintiff was relying upon the relationship in making his investment decision; and (5) the defendant's activity in initiating the transaction. *See Jett v. Sunderman*, 840 F.2d 1487, 1493 (citation omitted).

---

**12.** This case is unlike *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977), where we found a common law duty to disclose arising out of a quasifiduciary relationship. In *Sundstrand*, the defendant had personally performed investment banking services for the plaintiff, Sundstrand, in the past, and Sundstrand's officials had confidence in him; thus, "Sundstrand could properly rely on its preexisting and contemporaneous banker-client relationship with [the defendant] for fair disclosure." *Id.* at 1043.

This court has not had occasion to precisely delineate, in a comprehensive manner, the requisite elements of a 10b–5 aiding and abetting cause of action. *Cong. of Passion, Holy Cross,* 800 F.2d at 183. In *Barker v. Henderson,* 797 F.2d 490, 495, we concluded that, at the very minimum, the plaintiff must show that the alleged aider and abettor committed one of the "manipulative or deceptive" acts proscribed under section 10(b) and Rule 10b–5 with the same degree of scienter that is required for primary liability. *See also First Interstate Bank of Nev. v. Chapman & Cutler,* 837 F.2d 775, 779–80 & n. 4 (7th Cir.1988) (noting *Barker* requirements while holding that something more than "but-for" causation is also required for aiding and abetting liability).

In *Barker* we also cited the *additional* requirements for aiding and abetting liability established by several other courts: (1) the existence of a primary violator; (2) knowledge by the aider and abettor of the primary violation; and (3) substantial assistance by the aider and abettor in the perpetration of the primary violation. *See id.* at 496. As in *Barker,* we need not engage here in an analysis of these additional factors because the plaintiffs have failed to offer sufficient evidence to show even the minimal requirements of scienter and commission of a proscribed act.[13]

For purposes of summary judgment we shall presume, *arguendo,* a primary violation of the securities laws by ENI, upon which plaintiffs may base their claim of aiding and abetting liability. This primary violation would comprise both affirmative misrepresentations and nondisclosures of information by ENI. Specifically, plaintiffs assert that ENI salesmen expressly misrepresented that the Bank was providing 100% financing for ENI 1981–III, that the limited partnership was expected to generate enough revenue to pay off the indebtedness, that drilling sites had been selected near known ENI wells and that this was the best program offered by ENI. Reply Brief of Plaintiffs–Appellants at 22 n. 10. The facts allegedly not disclosed by ENI include the extensive loan relationships between the Bank and various ENI entities (including the loan to Victor Alhadeff, the principal operating officer of ENIX), ENIX's practice of collateralizing additional loans to ENI exploration programs with the future reserves of those programs and the fact that William Jenkins, the Bank's chief executive officer, had previously invested in two other ENI programs. *Schlifke I,* mem. op. at 9.

Plaintiffs first argue that the Bank's preparation of the allegedly misleading "sham" loan agreement constituted a "manipulative or deceptive act" as required for aiding and abetting liability under *Barker.* For the same reasons we rejected this characterization of the loan agreement in our earlier discussion of primary liability, we reject it here as to secondary liability. *Cf. Bane v. Sigmundr Exploration,* 848 F.2d 579, 581 (5th Cir.1988); *Wingsco Energy One v. Vanguard Groups Resources 1984,*

---

**13.** The district court, on the other hand, relied on *Delaney v. Blunt, Ellis & Loewi,* 631 F.Supp. 175 (N.D.Ill.1986), and accordingly presumed the applicability of the three-part test noted in the text for determining aiding and abetting liability. (Both parties have also conceded its applicability.) After engaging in an analysis of these three elements, the court concluded that plaintiffs had failed to establish the Bank's knowledge of the alleged primary violation by ENI or the Bank's "substantial assistance" in that violation. *See Schlifke I,* mem. op. at 10–12. The court's conclusions comport with those of the Fifth Circuit in the factually similar case of *Bane v. Sigmundr Exploration Corp.,* 848 F.2d 579 (5th Cir.1988). In *Bane,* investors in an oil and gas drilling program sought to hold a bank liable for aiding and abetting the program's principals in violating Rule 10b–5. The Fifth Circuit affirmed summary judgment in favor of the Bank, finding that the extension of loans to investors, secured by interests purchased in the program, was not evidence of "substantial assistance" because banks routinely engage in such transactions. *Id.* at 581. The court found that even if the bank had authorized the principals to use its loan documents, the inclusion of these documents—which contained no representations regarding the investment risks or reliability of the principals—in the investor package did not constitute "substantial assistance" for purposes of aiding and abetting a 10b–5 violation. *Id. Bane* supports the district court's ruling in this case under the three-part test. Because we find that plaintiffs fail to satisfy even the minimal requirements of *Barker,* however, we need not expressly adopt or proceed under this tripartite approach.

*Inc.,* [1988] Fed.Sec.L.Rep. (CCH) ¶ 94,038 at 90,863 (S.D.Tex. Sept. 15, 1988) [1988 WL 142135] (routine extension of loan does not satisfy "substantial assistance" element). Similarly, the Bank's silence regarding the alleged misrepresentations and omissions by ENI does not qualify as a "manipulative or deceptive act" even if we accept plaintiffs' assumption that the Bank had knowledge of ENI's conduct. For purposes of aiding and abetting liability, when the alleged proscribed act is nondisclosure of the primary violator's fraudulent conduct,

> knowledge of a material omission is not enough to violate the act or rule. There must also be a duty to disclose.... When the nature of the offense is a failure to "blow the whistle", the defendant must have a *duty* to blow the whistle. And this duty does not come from § 10(b) or Rule 10b–5; if it did the inquiry would be circular. The duty must come from a fiduciary relation outside securities law.

*Barker,* 797 F.2d at 495–96 (citing *Dirks v. SEC,* 463 U.S. at 653–64, 103 S.Ct. at 3260–66; *Chiarella v. United States,* 445 U.S. at 227–35, 100 S.Ct. at 1113–18). *See also LHLC Corp. v. Cluett, Peabody & Co., Inc.,* 842 F.2d 928, 932–33. As we concluded earlier, *see supra* at 944–946, the Bank possessed no fiduciary duty to disclose; thus, its silence cannot be deemed a "manipulative or deceptive act" under the principles of *Barker.*

Moreover, plaintiffs have adduced no facts showing that the Bank had knowledge of, or acted recklessly in failing to disclose, the fraudulent representations and omissions of ENI; hence, the requisite scienter requirement of *Barker* is lacking. *Cf. Seattle–First Nat'l Bank v. Carlstedt,* 678 F.Supp. 1543, 1549 n. 3 (W.D.Okl.1987) (aiding and abetting liability requires knowledge of the *fraud,* not merely the

undisclosed facts) (citing *Baranski v. Serhant,* 603 F.Supp. 232 (N.D.Ill.1985)). The undisputed testimony of Bank officers and ENI personnel confirms that the Bank had no knowledge of the activities of ENI sales personnel and, specifically, no knowledge of the accuracy of their statements pertaining to gas and oil exploration sites. In *Barker* we stated:

> The plaintiffs insist that the [law firms and accountants] *must* have known that the Foundation's selling documents were inaccurate and, because they did not do anything to stop the sales and answered queries from the Trustee, they *must* have had the necessary mental state. If this were enough to establish scienter, however, the scienter doctrine would not do anything to distinguish liability under § 10(b) and Rule 10b–5 from the presumptive or absolute liability under §§ 11, 12, 15, and 20. A plaintiff's case against an aider, abetter, or conspirator may not rest on a bare inference that the defendant 'must have had' knowledge of the facts. The plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators.

797 F.2d at 496–97. Even affording the plaintiffs the benefit of all reasonable inferences, they have not sufficiently demonstrated that the Bank had "thrown in his lot," and, as in *Barker,* "[t]here is no sound basis, therefore, on which a jury could infer that the [defendant] joined common cause with other offenders or aided and abetted a scheme with the necessary state of mind." [14]

### E. *"Controlling Person" Liability under Section 20(a)*

■ The last theory of liability in plaintiffs' arsenal involves their claim that the Bank qualifies as a "controlling person" of the ENI defendants and, therefore, is liable

---

**14.** With respect to scienter, we also stated in *Barker* that "[i]f the plaintiff does not have direct evidence of scienter, the court should ask whether the fraud (or cover-up) was in the interest of the defendants. Did they gain by bilking

the buyers of the securities?" 797 F.2d at 497. Plaintiffs' factually unsupported assertions that the Bank had an economic stake in the offering beyond the receipt of interest payments cannot

for ENI's 10b–5 violations.[15] The plaintiffs allege certain facts to establish that the Bank had control over ENI: (1) the Bank made extensive loans to ENIX and its related entities; (2) the Bank imposed liens on reserves found in ENI oil and gas programs (in 1982); (3) during a meeting in 1982 to discuss the ENI "watch list" loans, the Bank directed ENI to dispose of inventory, pursue assessments of limited partners and sell assets of limited partnerships in order to meet its loan obligations; and (4) the Bank prepared the loan documents, set guidelines for banks issuing letters of credit, sought banks to participate in the financing, provided additional, reserve-backed financing for ENI 1981–III in 1982 and, finally, conducted an independent engineering investigation in connection with that additional financing. *See Schlifke I,* mem. op. at 12. We agree with the district court that these facts are insufficient to sustain "control person" liability.

This circuit has not crystallized the test for determining when liability may be imposed on a "controlling person," yet in *Barker* we stated that "the ability to persuade and give counsel is not the same thing as 'control', which almost always means the practical ability to *direct* the actions of the people who issue or sell the securities." 797 F.2d at 494 (emphasis in original). Several circuits have adopted the two-prong test introduced in *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986), requiring the plaintiff to establish "that the defendant lender actually participated in (i.e., exercised control over) the operations of the [borrowing entity] in general. . . . [and] that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated." *Id.* at 631. *See, e.g., G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 957–58 (5th Cir.1981).

Other courts have applied a more rigorous test requiring "culpable participation" in the alleged illegal activity. *See, e.g., Orloff v. Allman,* 819 F.2d 904, 906 (9th Cir.1987); *Rochez Bros. v. Rhoades,* 527 F.2d 880, 889–90 (3rd Cir.1975); *Gordon v. Burr,* 506 F.2d 1080, 1085–86 (2d Cir.1974). We need not decide whether to adopt this more rigorous formulation for the Bank was not a "controlling person" even under the less demanding *Metge* test.

We agree fully with the district court's analysis of this issue. That court cited two reasons why the facts failed to satisfy the first element of *Metge.* First, the fact that the Bank extended a loan to a company to finance its investment programs and took measures to secure its loans does not establish actual exercise of control. *See Metge,* 762 F.2d at 631 (lending bank not a controlling person of an investment company selling limited shares in real estate programs despite facts that the bank was the primary lender, held nearly 20% of the company's stock, held a proxy on a 51% block of the company's subsidiary, sent personnel to the company's board meetings and had certain authority over the company's issuance of capital stock). Second, section 20(a) requires control at the time of the alleged violation; activities and events that occur later cannot support a claim of liability. *See e.g., Metge v. Baehler,* 577 F.Supp. 810, 816 (S.D.Iowa 1984), *rev'd on other grounds,* 762 F.2d 621 (8th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774. Thus, activities of the Bank occurring in 1982 cannot prove the Bank's control over ENI at the time of the alleged violation in November of 1981 when the limited partnership shares were sold.

Moreover, plaintiffs submit no evidence to support the second prong of the *Metge* test—potential for control over the specific activity upon which the primary violation is

---

provide a sound basis for inferring an intent to deceive.

**15.** Section 20(a) of the 1934 Securities Exchange Act, 15 U.S.C. section 78t(a), provides in relevant part:

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

**950**

predicated. The Bank had no power to control the ENI sales personnel or to dictate the manner in which the allegedly fraudulent sales of securities were made; it merely prescribed requirements for the letters of credit that it would accept as security for the loan to ENI 1981–III. In the absence of evidence to the contrary, the district court properly granted summary judgment on the issue of "controlling person" liability.

### III.

The court below properly concluded that the Bank's provision of commercial lending services in this case did not implicate the federal securities laws under any of the manifold theories presented by the plaintiffs. "Public policy dictates that sophisticated investors such as these [plaintiffs] not be allowed to harass on fanciful bases financial institutions which are merely performing the functions that society and the law have created for them." *Seattle–First Nat'l Bank v. Carlstedt*, [1984] Fed.Sec.L. Rep. (CCH) ¶ 91,499 at 98,520 (W.D.Okla. May 17, 1984), *rev'd on other grounds*, 800 F.2d 1008 (10th Cir.1986), *on remand*, 678 F.Supp. 1543 (W.D.Okla.1987) (granting summary judgment). For all these reasons, the grant of summary judgment in favor of the Bank is

AFFIRMED.