905 F.2d 1040
 Fed. Sec. L. Rep. P 95,313
Paul RENOVITCH, Barbara Renovitch, Donald K. Johnson,
Lawrence Wise, and the Willard E. Schafer Trust by Mrs.
Esther Schafer, trustee, on behalf of themselves and all
purchasers of securities issued by Intercontinental Cattle
Corporation or Great Western Leasing Company and sold by
Stewardship Concepts Incorporated, Plaintiffs-Appellants,
v.
Jay C. KAUFMAN and James Bussard, Defendants-Appellees.
 No. 89-2478.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 2, 1990.
Decided June 20, 1990.
 
 1
 James E. Beckley, Christopher J. Barber, Marsha A. Tolchin, Adler, Kaplan & Begy, Chicago, Ill., for plaintiffs-appellants.
 
 
 2
 Jerome H. Torshen, Mark K. Schoenfield, James K. Genden, Torshen, Schoenfield & Spreyer, Chicago, Ill., for defendant-appellee Jay Kaufman, a Mich. resident.
 
 
 3
 David J. Parsons, Jill A. Pieper, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant-appellee, James Bussard, a Mich. resident.
 
 
 4
 Before FLAUM and KANNE, Circuit Judges, and NOLAND, Senior District Judge.*
 
 
 5
 NOLAND, Senior District Judge.
 
 
 6
 The plaintiffs, a class of dissatisfied investors, brought this securities fraud suit against numerous individual and corporate defendants, including two attorneys, Jay C. Kaufman and James Bussard. Plaintiffs sought to hold defendants Kaufman and Bussard liable for, inter alia, "aiding and abetting" a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and the Securities and Exchange Commission's Rule 10b-5, 17 C.F.R. Sec. 240.10b-5. The district court granted summary judgment in favor of defendants Kaufman and Bussard. After finding no just reason to delay appeal, the district court certified its Memorandum Opinion and Order as a final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, and the plaintiffs appealed. We affirm.
 
 I. BACKGROUND
 
 7
 John Anderson and Lester "Skip" Bunker came up with an idea to sell interests in a cattle leasing program as tax shelters. To further their scheme, they prepared a brochure to be distributed to potential investors. The brochure, which was entitled "Intercontinental Cattle Corporation Presents Holstein Dairy Cattle Leasing" ("the ICC brochure"), described how the cattle leasing program was to operate.[1] Anderson and Bunker had copied the ICC brochure from a brochure of another cattle leasing company, Continental Financial Limited, and had simply substituted Intercontinental Cattle Corporation as the name of the offeror. For purposes of this appeal, it is conceded that the ICC brochure contained several misrepresentations and material omissions regarding the quality of the cattle leasing investment.[2]
 
 
 8
 In early January 1982, Anderson and Bunker, with copies of their ICC brochure in hand, consulted defendant James Bussard, an attorney who had performed various legal work for them in the past.[3] They provided attorney Bussard with a copy of the ICC brochure. Anderson and Bunker then told Bussard that they were interested in selling the cattle leases "as a tax sheltered program" and asked him if there were any problems in doing so. After "scanning" the brochure, Bussard responded negatively. He also told Anderson and Bunker that their program was "very ambitious" and advised them "to get counsel that knows what they're doing." Bussard did not verify the truth of the representations made in the ICC brochure, nor did he conduct an independent investigation to determine if the brochure contained any material omissions.
 
 
 9
 Following the January meeting, Bussard continued to perform routine legal work for Anderson and Bunker during the early part of 1982. He drafted and filed the articles of incorporation that formed Intercontinental Cattle Corporation ("ICC"). Anderson and Bunker created ICC for the purpose of operating the cattle leasing program. ICC was the original entity that promoted, sold, and administered the program. Attorney Bussard also drafted a will for Anderson and incorporated Robinson Dairy Farms for Bunker and others.
 
 
 10
 Sometime in early 1982, Anderson and Bunker showed the ICC brochure to Thomas Early, a longtime friend of Anderson. Mr. Early recommended that they contact Douglas Gray, president and majority shareholder of Stewardship Concepts, Inc. ("SCI"), for the purpose of marketing the cattle leasing program. SCI is in the business of advising individuals with regard to financial planning, investment programs, and retirement planning.
 
 
 11
 In the spring of 1982, Early sent a copy of the ICC brochure to Gray and asked him if he would be interested in having SCI market the ICC cattle leasing program. Gray then discussed the cattle leasing program with his attorney, defendant Jay C. Kaufman. Attorney Kaufman had performed various legal work for Gray in the past and at the time was specializing in estate planning and employee benefits. Gray provided Kaufman a copy of the ICC brochure. After discussing the investment program with Kaufman, Gray met with Anderson, Bunker, and Early and agreed to have SCI market the program. In July 1982, SCI began soliciting investors to purchase interests in ICC's cattle leasing program. SCI counselors distributed copies of the ICC brochure to potential investors, including the plaintiffs.
 
 
 12
 During this time, defendant Kaufman was serving as a "cooperating attorney" for SCI in connection with its estate planning activities. As such, he received client referrals from SCI counselors. These clients were referred to Kaufman for "the purpose of evaluating their estate planning, making recommendations with respect to appropriate estate planning, and if the client wanted, preparing the appropriate documents to implement those recommendations." Kaufman Depo., p. 13. In addition, Kaufman participated in training sessions for SCI employees. For example, he taught a "Principles of Estate Planning" course to SCI counselors.
 
 
 13
 In June 1983, attorney Kaufman drafted on behalf of Gray the documentation necessary to incorporate a third company, Great Western Leasing Corporation ("Great Western"). Gray formed Great Western to market the cattle leasing program, a function previously performed by SCI. A second sales brochure, nearly identical to the ICC brochure, was printed under Great Western's name; it too contained misrepresentations and material omissions. Kaufman was listed as general counsel for Great Western on the second page of the Great Western brochure. Defendant Kaufman did not learn that his name was printed on the Great Western brochures until after they were distributed to investors; more importantly, he never consented to the use of his name by Great Western. Later, in the fall of 1983, Kaufman also incorporated Dairy Reporting Service, Inc., a company designed to inspect and report on the dairy cattle leased under the program.
 
 
 14
 Sometime after ICC, SCI, and Great Western began selling the cattle leases, state authorities in Wisconsin and Michigan inquired as to whether the leases were in fact securities, and, if so, whether they should be registered. Bunker retained attorney Bussard to respond to the state inquiries regarding the unregistered status of the securities. Gray retained attorney Kaufman for the same reason.
 
 
 15
 By February 1984, approximately 122 investors had contributed over $2.3 million to the cattle leasing program. These investors lost in excess of $1.5 million when the investment program eventually failed. In some cases cattle were never purchased; instead, investors' funds were used to make payments to other investors. Many cattle were placed on farms with inadequate facilities to support a dairy operation. As a result, numerous cattle died or stopped producing milk. Finally, many cattle were sold for slaughter without the investors' permission; the proceeds from these sales were then used to pay other investors or to purchase a lesser number of replacement cattle.
 
 
 16
 The plaintiffs (over one hundred investors in the cattle leasing program) brought a class action against numerous defendants, including ICC, SCI, Great Western, Anderson, Bunker, Gray, Kaufman, and Bussard. This appeal involves only two of the defendants named in the plaintiffs' amended complaint: attorneys Kaufman and Bussard. The plaintiffs' amended complaint originally stated a myriad of federal and state-law claims.[4] However, only two of those claims remain on appeal: (1) "aiding and abetting" a violation of Section 10(b) and Rule 10b-5, and (2) fraud under Illinois law. Both claims are concerned solely with the misrepresentations and material omissions contained in the two brochures distributed to the plaintiff investors.[5]
 
 
 17
 The district court granted summary judgment in favor of defendants Kaufman and Bussard on the plaintiffs' two remaining claims. The district court concluded:
 
 
 18
 Plaintiffs here have presented no evidence that either Kaufman or Bussard acted with scienter [which is a necessary element in a securities fraud case brought under Section 10(b) and Rule 10b-5]. Indeed, plaintiffs fail to come forward with any evidence that the attorneys even knew of the alleged primary securities law violations, to wit: that the factual statements in the brochures were false or misleading. Plaintiffs themselves argue in their briefs that the attorneys never made any factual investigation into the accuracy of the statements in the brochures. There is no evidence that the attorneys had any reason to know that the true state of affairs was different from what was represented in the brochures.
 
 
 19
 Memorandum Opinion and Order, pp. 7-8 (citations omitted). For the same reasons, the district court also found that the plaintiffs failed to present sufficient evidence from which a reasonable jury could conclude that defendants Kaufman and Bussard had committed fraud in violation of Illinois law.
 
 II. DISCUSSION
 A. Standard of Review
 
 20
 We review de novo a district court's grant of summary judgment. Greer Properties, Inc. v. LaSalle Nat'l Bank, 874 F.2d 457, 459 (7th Cir.1989). A motion for summary judgment shall be granted forthwith if the pleadings and discovery "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). In determining whether a genuine issue of material fact exists, a trial court must view the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. Spring v. Sheboygan Area School District, 865 F.2d 883, 886 (7th Cir.1989). However,
 
 
 21
 Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.... [T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.
 
 
 22
 Anderson, 477 U.S. at 256-57, 106 S.Ct. at 2514; see also Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
 
 
 23
 At the summary judgment stage, a trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249, 106 S.Ct. at 2511. "A genuine issue of material fact exists only where 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " Wolf v. City of Fitchburg, 870 F.2d 1327, 1329 (7th Cir.1989) (quoting Anderson, 477 U.S. at 249, 106 S.Ct. at 2511). In other words, summary judgment may be granted if the evidence favoring the nonmoving party "is merely colorable or is not significantly probative." Anderson, 477 U.S. at 249-50, 106 S.Ct. at 2511 (citation omitted). Thus, the summary judgment inquiry addresses "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52, 106 S.Ct. at 2512. With these summary judgment principles in mind, we now analyze this case.
 
 
 24
 B. Aiding and Abetting a Violation of Section 10(b) and Rule 10b-5
 
 
 25
 The plaintiffs argue that sufficient evidence exists in the record from which a reasonable jury could conclude that defendants Kaufman and Bussard "aided and abetted" a violation of Sec. 10(b) and Rule 10b-5. This court disagrees.
 
 
 26
 Section 10(b) prohibits any person from using or employing "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security. 15 U.S.C. Sec. 78j(b). Similarly, Rule 10b-5, which was promulgated under Sec. 10(b), makes it unlawful for any person, in connection with the purchase or sale of a security:
 
 
 27
 (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.
 
 
 28
 17 C.F.R. Sec. 240.10b-5. Although not expressly mandated by either the statute or the rule, "[t]his circuit has recognized a cause of action for aiding and abetting under section 10(b) and Rule 10b-5." Schlifke v. Seafirst Corp., 866 F.2d 935, 946 (7th Cir.1989).[6] It is important to emphasize, however, that such a cause of action "does not sweep up all people who can be characterized as participants in or contributors to the success of the firm that issues the securities." Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 495 (7th Cir.1986).
 
 
 29
 In order to establish secondary liability[7], a plaintiff, at the very minimum, must prove two elements: (1) that the alleged aider and abettor, in connection with the purchase or sale of a security, committed one of the "manipulative or deceptive" acts prohibited under Sec. 10(b) and Rule 10b-5, and (2) that the alleged aider and abettor acted with scienter, which is the same mental state required for primary liability. Schlifke, 866 F.2d at 947.[8] The Supreme Court has defined "scienter" in the context of securities fraud as the "intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). This circuit has held that a showing of reckless conduct also satisfies the requirement of wrongful intent. Rowe v. Maremont Corp., 850 F.2d 1226, 1238 (7th Cir.1988); Barker, 797 F.2d at 495; Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1039-45 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).
 
 
 30
 In the present case, insufficient evidence exists in the record from which a reasonable jury could conclude that Kaufman or Bussard committed a "manipulative or deceptive" act proscribed by Sec. 10(b) and Rule 10b-5, let alone that he committed that act with scienter. Therefore, the district court was correct in granting summary judgment in favor of defendants Kaufman and Bussard.
 
 
 31
 The only "manipulative or deceptive" acts allegedly committed by either Kaufman or Bussard in connection with the sale or purchase of a security relate to the misrepresentations and material omissions contained in the ICC brochure and the Great Western brochure. The evidence presented, when viewed in the light most favorable to the plaintiffs, reveals the following:
 
 
 32
 --neither Kaufman nor Bussard prepared either the ICC brochure or the Great Western brochure;
 
 
 33
 --neither attorney authorized the preparation of the brochures;
 
 
 34
 --neither attorney expressly authorized the distribution of the brochures;
 
 
 35
 --neither attorney distributed or assisted in distributing the brochures;
 
 
 36
 --neither attorney sold the securities offered in the brochures; and
 
 
 37
 --neither attorney recommended to any of the plaintiffs that they purchase interests in the cattle leasing program.
 
 
 38
 Moreover, Bussard's name did not appear on either brochure. Kaufman's name did appear on the Great Western brochure; however, it is undisputed that Kaufman did not know this until after the brochures were distributed and that he never consented to the use of his name by Great Western.
 
 
 39
 Attorney Bussard did "scan" the ICC brochure before it was distributed to the plaintiffs. Attorney Kaufman likewise reviewed the ICC brochure during his discussion with Gray regarding SCI's marketing of the cattle leasing program. Later, he also read the Great Western brochure and learned that his name had been printed on that brochure without his permission. As the district court carefully noted, however, the plaintiffs provide no explanation of how the factual misrepresentations and material omissions contained in the offering brochures could have been detected from the face of those brochures. In sum, the plaintiffs have failed to present any direct evidence that either Kaufman or Bussard committed any "manipulative or deceptive" act with the requisite state of mind--scienter.
 
 
 40
 This does not end our inquiry, though, for when a plaintiff fails to produce direct evidence of scienter, the court should examine whether there is indirect evidence of scienter by considering whether the alleged aider and abettor profited from the fraud. Barker, 797 F.2d at 497 ("If the plaintiff does not have direct evidence of scienter, the court should ask whether the fraud (or cover-up) was in the interest of the defendants. Did they gain by bilking the buyers of the securities?"). In other words, is there "some reason to conclude that the defendant has thrown in his lot with the primary violators"? Id. The district court concluded that there was insufficient evidence to show that either Kaufman or Bussard threw in his lot with the primary violators. We agree.
 
 
 41
 Attorney Kaufman did not gain financially from the fraudulent cattle leasing scheme. At the time the interests in the cattle leasing program were sold, he was not a shareholder of ICC, SCI, or Great Western, nor was he a business partner with any person named as a defendant in this case. Kaufman did once hold a financial interest in SCI, but he parted with that interest in October 1980, well over a year prior to the initiation of the cattle leasing program. The plaintiffs make much of the fact that Kaufman, as a "cooperating attorney" for SCI, received client referrals from SCI counselors and therefore had an interest in seeing that SCI was successful. However, Kaufman only represented the clients referred to him by SCI for estate planning purposes; he did not recommend that these clients make investments in the cattle leasing program or any other investment offered by SCI. Moreover, the fee Kaufman charged these clients was not in any way related to the success of SCI, its counselors, or the cattle leasing scheme. This court agrees with the conclusion of Judge Marovich that the receipt of client referrals in this case is too tenuous a basis for finding that Kaufman acted with scienter.
 
 
 42
 There is a dispute as to whether attorney Bussard gained financially from the sale of interests in the cattle leasing program. Bunker testified in his deposition that he and Anderson split ICC's profits "50/50," thus implying that Bussard did not have an interest in ICC. Later in his deposition, however, Bunker testified that he thought Bussard held a 2% interest in ICC. Bussard denies ever having owned an interest in ICC.[9] This factual dispute is immaterial, however, for this court agrees with the district court's conclusion that even if Bussard were found to be a 2% shareholder, that evidence is not, standing alone, sufficient to support an inference that he "has thrown in his lot with the primary violators." The plaintiffs have simply failed to present direct or indirect evidence that either attorney acted with scienter.
 
 
 43
 In the absence of direct or indirect evidence of scienter, the plaintiffs raise two specious arguments in an attempt to hold attorneys Kaufman and Bussard liable on an aiding and abetting theory. First, they argue that Kaufman and Bussard "must have known" of the misrepresentations and material omissions in the two brochures because of their close relationship with the primary violators and their involvement in creating the various defendant corporations. This same argument, however, was flatly rejected in Barker when this court stated:
 
 
 44
 The plaintiffs insist that the [defendant law and accounting] Firms must have known that the Foundation's selling documents were inaccurate and, because they did not do anything to stop the sales and answered queries from the Trustee, they must have had the necessary mental state. If this were enough to establish scienter, however, the scienter doctrine would not do anything to distinguish liability under Sec. 10(b) and Rule 10b-5 from the presumptive or absolute liability under Secs. 11, 12, 15, and 20. A plaintiff's case against an aider, abetter, or conspirator may not rest on a bare inference that the defendant "must have had" knowledge of the facts. The plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators.
 
 
 45
 797 F.2d at 496-97 (emphasis in original).
 
 
 46
 Second, the plaintiffs argue that the primary violations never would have occurred "but for" the actions of the defendant attorneys; therefore, Kaufman and Bussard ought to be held secondarily liable. This "but for" argument also has been expressly repudiated by this circuit because it, too, would impose strict liability. In First Interstate Bank of Nevada v. Chapman & Cutler, 837 F.2d 775 (7th Cir.1988), this court stated: "The district court merely relied on the Second Circuit's opinion [in Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57 (2d Cir.1985) ] in holding that but-for causation is not sufficient to state an aiding and abetting claim. We agree that something more than but-for causation is required." 837 F.2d at 779 (citations omitted); see also Schlifke, 866 F.2d at 947.
 
 
 47
 Finally, this circuit has suggested in prior cases that a failure to disclose a misrepresentation or material omission may satisfy the requirement of a "manipulative or deceptive" act in violation of Sec. 10(b) and Rule 10b-5--but only if there were a duty to disclose. Schlifke, 866 F.2d at 948; LHLC Corp. v. Cluett, Peabody & Company, Inc., 842 F.2d 928, 932-33 (7th Cir.1988); Barker, 797 F.2d at 495. The plaintiffs repeatedly argue that Kaufman and Bussard had a "duty to disclose." What information plaintiffs believe these defendants were obligated to disclose is not clear, however. Plaintiffs' argument appears to be that Kaufman and Bussard had a duty to disclose the misrepresentations and material omissions in the brochures, or, perhaps, that they had a duty to disclose their general knowledge of the fraudulent cattle leasing program being run by their clients. But this argument assumes facts not supported by the record: namely, that Kaufman and Bussard knew of the misrepresentations and omissions in the brochures or that they knew of the fraudulent scheme perpetrated by their clients. For this reason, the plaintiffs' duty to disclose argument fails.
 
 
 48
 Even if evidence in the record supported an inference that Kaufman and Bussard knew of the fraudulent scheme, it is clear that attorney Bussard would not have had a duty to disclose that information to the class plaintiffs, and it is uncertain whether attorney Kaufman would have possessed such a duty. Simply put, lawyers are not required "to tattle on their clients in the absence of some duty to disclose. To the contrary, attorneys have privileges not to disclose." Barker, 797 F.2d at 497 (citations omitted).
 
 
 49
 As this circuit has explained in previous cases,
 
 
 50
 [f]or purposes of aiding and abetting liability, when the alleged proscribed act is nondisclosure of the primary violator's fraudulent conduct,
 
 
 51
 knowledge of a material omission is not enough to violate the act or rule. There must also be a duty to disclose.... When the nature of the offense is a failure to "blow the whistle", the defendant must have a duty to blow the whistle. And this duty does not come from Sec. 10(b) or Rule 10b-5; if it did the inquiry would be circular. The duty must come from a fiduciary relation outside securities law.
 
 
 52
 Schlifke, 866 F.2d at 948 (quoting Barker, 797 F.2d at 495-96).[10] Attorney Bussard did not have a fiduciary relationship with any of the plaintiff investors. He never represented or counseled any of the plaintiffs. In fact, he did not have any contact with any of the plaintiffs, nor did he take any action upon which they relied. Similarly, attorney Kaufman did not have a fiduciary duty to any of the plaintiffs at the time they purchased their interests in the cattle leasing scheme. Attorney Kaufman did represent four of the class plaintiffs for estate planning purposes after they had purchased interests in the investment program. Whether defendant Kaufman had a duty to disclose to those four plaintiffs is a question that this court need not decide because, as previously indicated, insufficient evidence exists in the record to support an inference that Kaufman knew of the misrepresentations and omissions in the brochures or that he knew of the fraudulent scheme perpetrated by his clients.
 
 
 53
 For all of the foregoing reasons, we come to the same conclusion that was previously reached by this court inBarker: "There is no sound basis, therefore, on which a jury could infer that [defendants Kaufman and Bussard] joined common cause with other offenders or aided and abetted a scheme with the necessary state of mind." 797 F.2d at 497. Thus, the district court properly granted summary judgment in favor of defendants Kaufman and Bussard on the plaintiffs' claim of aiding and abetting a violation of Sec. 10(b) and Rule 10b-5.
 
 C. Common Law Fraud
 
 54
 The plaintiffs also contend that the district court erred in granting summary judgment in favor of defendants Kaufman and Bussard on count VIII of their amended complaint, which alleges fraud under Illinois common law. We disagree.
 
 
 55
 No separate cause of action for aiding and abetting a fraud exists under Illinois law.[11] Rather, in order to establish liability for fraud under Illinois law, a plaintiff must plead and prove these elements: "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance." Board of Education of City of Chicago v. A, C and S, Inc., 131 Ill.2d 428, 137 Ill.Dec. 635, 16, 546 N.E.2d 580, 591 (1989); see also Smith v. Jones, 113 Ill.2d 126, 100 Ill.Dec. 560, 563, 497 N.E.2d 738, 741 (1986). The plaintiffs have failed to produce sufficient evidence to prove even the first element. The only "false statements of material fact" allegedly made by either Kaufman or Bussard are the misrepresentations contained in the ICC and Great Western brochures.[12] As stated previously, however, neither Kaufman nor Bussard prepared, authorized, or distributed the brochures. The plaintiffs have failed to produce any evidence that these two defendants made any "false statements of material fact" upon which the plaintiff investors relied. Finally, for the same reasons that we earlier found scienter lacking, we find that insufficient evidence exists from which a reasonable jury could infer that Kaufman or Bussard knowingly participated in a scheme to defraud.
 
 III. CONCLUSION
 
 56
 For the foregoing reasons, the court concludes that insufficient evidence exists in the record from which a reasonable jury could infer that either defendant Kaufman or defendant Bussard committed one of the "manipulative or deceptive" acts proscribed by Sec. 10(b) and Rule 10b-5, let alone that he committed that act with scienter. Therefore, the district court was correct in granting summary judgment in favor of these two defendants on the plaintiffs' claim of "aiding and abetting" a violation of Sec. 10(b) and Rule 10b-5. Furthermore, insufficient evidence exists to support a claim against either defendant based on fraud under Illinois law. Thus, the district court was correct in granting summary judgment against the plaintiffs on their fraud claim as well. Accordingly, the decision of the district court is affirmed in its entirety.
 
 
 57
 AFFIRMED.
 
 
 
 *
 The Honorable James E. Noland, Senior District Judge for the Southern District of Indiana, is sitting by designation
 
 
 [1]
 In a nutshell, the investment program was to operate as follows. When investors joined the program, Anderson and Bunker were to use the investors' contributions to purchase dairy cattle for those investors. The cattle then were to be marked for identification and leased to dairy farmers. In exchange for their investment contributions, the investors were to receive ownership rights in the dairy cattle, lease payments, and various tax benefits
 
 
 [2]
 The following misrepresentations are alleged by the plaintiffs: "(a) the cattle would be maintained in good condition; (b) an independent inspector would provide to the owner an accurate and truthful report about the condition of the herd and the farm each month; (c) any cow would be replaced by the farmer if its productivity dropped below commercially acceptable levels; [and] (d) the farmer would maintain insurance on the herd to protect against loss from other causes." Amended Complaint p 42
 
 
 [3]
 Defendant Bussard is a general-practice attorney; he does not specialize in securities law or in any other particular area of the law
 
 
 [4]
 The plaintiffs' amended complaint originally contained eight counts: failure to register securities in violation of the Securities Act of 1933 (count I); misrepresentations, fraud, and material omissions in violation of the Securities Act of 1933 (count II); misrepresentations, fraud, and material omissions in violation of the Securities Exchange Act of 1934 (count III); violations of the Racketeer Influenced and Corrupt Organizations Act of 1970 (count IV); violations of the Illinois Securities Act (count V); violations of Wisconsin Securities Law (count VI); violations of New York General Business Law (count VII); and fraud in violation of Illinois common law (count VIII). Count V was dismissed by the district court. See Renovitch v. Stewardship Concepts Inc., 654 F.Supp. 353 (N.D.Ill.1987). Counts I, II, IV, and VI were dismissed pursuant to stipulation of the parties. Id. at 356 n. 2. In addition, the district court denied the plaintiffs' motion for leave to add an additional count alleging breach of fiduciary duty; the plaintiffs do not appeal that decision. Finally, the district court granted summary judgment in favor of defendants Kaufman and Bussard on count VII, and the plaintiffs do not challenge that decision on appeal
 
 
 [5]
 No other representations, written or oral, were allegedly made to the plaintiffs by defendant Kaufman or defendant Bussard. See Plaintiffs' Amended Complaint pp 42-44 (and counts III and VIII); Plaintiffs' Stipulation dated April 8, 1988, p 2; Amended Reply Brief of Plaintiffs-Appellants, pp. 2, 7
 In their briefs on appeal, plaintiffs dwell on extraneous facts concerning Kaufman and Bussard's representation of their clients in disputes with state authorities in Michigan and Wisconsin. Those disputes concerned the unregistered status of the securities. Kaufman and Bussard's dealings with state authorities regarding securities registration are irrelevant to this appeal for at least two reasons. First, plaintiffs' failure-to-register claim (count I) has been dismissed and is not before this court on appeal. Second, the plaintiffs have failed to show how they were adversely affected by Kaufman and Bussard's advice to their clients regarding the registration issue; any misrepresentations made by them in this context were directed at the state authorities, not the plaintiffs. See Latigo Ventures v. Laventhol & Horwath, 876 F.2d 1322, 1325 (7th Cir.1989) ("Investors cannot complain about a fraud that did not cause them any harm.... A fraud that does not affect the decision to make an investment in which the loss complained of is incurred is not actionable under Rule
 10b-5"); Smith v. Jones, 113 Ill.2d 126, 100 Ill.Dec. 560, 563, 497 N.E.2d 738, 741 (1986) (stating that, in a fraud action, a plaintiff must prove, inter alia, reliance on a misrepresentation and injury resulting therefrom).
 
 
 [6]
 See also LHLC Corp. v. Cluett, Peabody & Company, Inc., 842 F.2d 928, 932 (7th Cir.1988) (stating that "victims may collect from aiders and abetters under Sec. 10(b) and Rule 10b-5 even though they do not satisfy the requirements of controlling or controlled party liability under Sec. 20 of the '34 Act"); Barker v. Henderson, Franklin, Starnes & Nolt, 797 F.2d 490, 495 (7th Cir.1986) (stating that "Sec. 10(b) and Rule 10b-5 establish liability for aiders, abetters, and conspirators with those primarily liable")
 
 
 [7]
 "Aiding and abetting" a violation of Section 10(b) and Rule 10b-5 is referred to by courts and commentators as "secondary liability." E.g., Fischel, Secondary Liability Under Section 10(b) of the Securities Act of 1934, 69 Calif.L.Rev. 80 (1981). For purposes of this appeal, it is assumed that other defendants (not a part of this appeal) committed "primary violations" of Section 10(b) and Rule 10b-5. In order to state a claim for a primary violation, the plaintiff must allege that the defendant: (1) made an untrue statement of material fact or omitted a material fact that rendered the statements made misleading, (2) in connection with the purchase or sale of a security (3) with the intent to mislead, and (4) which caused plaintiff's loss. Schlifke v. Seafirst Corp., 866 F.2d 935, 943 (7th Cir.1989). Thus, primary and secondary liability differ in that one may be held secondarily liable without having actually purchased or sold a security. See LHLC Corp., 842 F.2d at 932 (noting "that a party other than the purchaser or seller of the securities faces liability as an aider and abetter only if it committed one of the fraudulent or manipulative acts with the requisite intent--that is, only if it would have been primarily liable had it purchased or sold the securities."); Barker, 797 F.2d at 495 (same)
 Although this circuit has recognized a cause of action for aiding and abetting a violation of Sec. 10(b) and Rule 10b-5, it has also questioned the propriety of implying such a cause of action from the securities laws. See Schlifke, 866 F.2d at 946; Latigo Ventures v. Laventhol & Horwath, 876 F.2d 1322, 1327 (referring to secondary liability as a "judge-made concept" and questioning "the appropriateness of judicial creativity in borrowing that criminal law concept [i.e., aiding and abetting] for use in securities law"). It is important to note that the Supreme Court has twice reserved decision on the issue of secondary liability under Sec. 10(b) and Rule 10b-5. Herman & MacLean v. Huddleston, 459 U.S. 375, 379 n. 5, 103 S.Ct. 683, 685 n. 5, 74 L.Ed.2d 548 (1983); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 191 n. 7; 96 S.Ct. 1375, 1380 n. 7, 47 L.Ed.2d 668 (1976).
 
 
 [8]
 See also Barker, 797 F.2d at 496 (stating that in order to establish secondary liability, plaintiff must prove "scienter and the defendants' commission of a proscribed act"); LHLC Corp., 842 F.2d at 932 (noting that "a party other than the purchaser or seller of the securities faces liability as an aider and abetter only if it committed one of the fraudulent or manipulative acts with the requisite intent")
 
 
 [9]
 Neither the articles of incorporation nor the minutes from the first board meeting list Bussard as a shareholder of ICC
 
 
 [10]
 See also LHLC Corp., 842 F.2d at 932, in which this court stated:
 When the problem consists in keeping silence while the primary violator carries out the fraud, the plaintiff must show that the silent person had a legal duty to speak.... Barker held that a law firm and an accounting firm were not obliged to speak up concerning any knowledge they may have had about an ongoing fraud, and as a result their silence--even if morally culpable--did not have legal consequences under the securities laws.
 
 
 [11]
 See Cenco, Inc. v. Seidman & Seidman, 686 F.2d 449, 452 (7th Cir.1982) (noting that "[t]here is no tort of aiding and abetting [a fraud] under Illinois law or, so far as we know, the law of any state"); Shacket v. Philko Aviation, Inc., 590 F.Supp. 664, 668 (N.D.Ill.1984) ("Illinois case law recognizes no separate tort of aiding and abetting fraud.... But a person who knowingly participates in a fraud or who knowingly accepts the fruits of fraudulent conduct is also guilty of that fraud.")
 
 
 [12]
 Plaintiffs' Amended Complaint, Count VIII (incorporating pp 42-46); see also Renovitch v. Stewardship Concepts, Inc., 654 F.Supp. 353, 360 (N.D.Ill.1987). This court will not discuss additional misrepresentations purportedly made by the defendants that have been asserted by the plaintiffs for the first time in their appellate briefs. A party cannot amend its complaint on appeal by alleging new facts in its appellate brief