Barbara HAYES, et al., Plaintiffs,

v.

RAYTHEON CO., et al., Defendants.

No. 90 C 1068.

United States District Court,
N.D. Illinois, E.D.

Nov. 12, 1992.

William J. Harte, Erik Daniel Gruber, William J. Harte, Ltd., Chicago, IL, for plaintiffs.

John T. Burke, John T. Burke, Jr., John T. Burke & Associates, P.C., Chicago, IL, for defendants.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

Plaintiffs Barbara Hayes, Special Administrator for the Estate of Cyndee Hayes (Hayes), and Carol Sampson (Sampson) bring this action for damages based on theories of product liability, negligence, and wrongful death as a result of illnesses allegedly sustained by plaintiffs as a result of exposure to "radiant energy" emitted from Raytheon video display terminals (VDTs). Defendants Raytheon Company (Raytheon) and Raytheon Service Company (Raytheon Service) now move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, defendants' motion is granted.

Federal subject matter jurisdiction is based on 28 U.S.C. § 1332, the parties being of diverse citizenship and the amount in controversy exceeding $50,000.

## FACTS

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Renovitch v. Kaufman,* 905 F.2d 1040, 1044 (7th Cir. 1990). The movant has the burden of demonstrating lack of genuine issue of material fact. *Celotex Corporation v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In assessing a motion for summary judgment we examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," resolving all doubts in favor of the non-movant. Fed.R.Civ.P. 56(c). For that purpose we draw all reasonable inferences in favor of the non-movant, but we are "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). The facts recited reflect the above standard.

Raytheon Company designed, manufactured, distributed and sold programmable terminal systems, including the 1974 Model No. 4101 (hereinafter "the programmable terminal system"). Raytheon Service is a corporation that distributed and sold the programmable terminal system. This system was installed at the offices of KLM Royal Dutch Airlines in 1974.

Plaintiff's decedent, Hayes, worked at the Chicago office of KLM Airlines from May 1977 until 1980. Sampson worked at the same office from April 1979 until December 1980. During the course of their employment plaintiffs operated programmable terminal systems manufactured by Raytheon. Both Hayes and Sampson held the same job, which consisted of taking reservations over the telephone and entering them into the computer system.

In February 1981, Sampson was seen by Dr. Milton Zaret (Dr. Zaret), an ophthalmologist, for the first time. She was reexamined by Dr. Zaret on four separate occasions, the last examination being on March 10, 1986. Dr. Zaret prepared a report in February 1984 concerning his examinations of Sampson covering the period from February 1981 through November 1983. Based upon his review of Sampson's medical history and a finding of "extensive posterior capsular changes" in her eyes, Dr. Zaret concluded that Sampson suffered

from "Hertzian-induced" cataracts, that is, cataracts resulting from exposure to "radiant energy." The doctor diagnosed Sampson with three "radiant energy injuries"— "radiant energy cataracts," carcinoma *in situ* of the uterine cervix and polyps in her colon.[1] This, combined with her history of having used VDTs, led Dr. Zaret to reach this diagnosis. As of 1988, Sampson's gynecological problem was at an arrested stage (Zaret dep. at 160–61).

On November 2, 1980, Hayes died of cervical cancer. Although Dr. Zaret never personally examined Hayes, he examined her medical records and prepared a written report in April 1989 concerning his review of her records. Dr. Zaret's opinion is that there was a causal connection between Hayes' cancer of the uterine cervix and her exposure to radiant energy at levels emitted by VDTs, such as those used at KLM during her employment.

At this time Dr. Zaret is the only expert who has submitted an opinion on the plaintiffs' behalf. Dr. Zaret is a medical doctor licensed in the State of New York. He has researched the effects of radiant energy for the past thirty-five years (Zaret aff. ¶ 1). Doctor Zaret testified that he spends approximately half of his time in personal research, most of which relates to cancer (Zaret dep. at 10). His theory is essentially that the VDTs at KLM were emitting "extraordinary levels of non-ionizing radiation" and that, in light of plaintiffs' use of the VDTs, their physical symptoms and medical history, their "radiant energy injur[ies]" (the cataracts and cancer of the uterine cervix) were caused by radiant exposure from the VDTs.

Dr. Zaret relied on a survey report that had been prepared by Eli Port (Port) of

Radiation Detection Services, in concluding that significant amounts of radiation were being emitted from the VDTs. In March 1980, Port had inspected the room at the KLM office where the VDTs were located, for radiation leakage, and documented his findings on a survey report. This report noted that there were "spurious off-scale readings" which, according to Dr. Zaret, established that there was significant radiation leakage from the VDTs. Port, however, concluded in his report that there had been "no leakage radiation detectable above normal background for any terminal." Throughout his deposition, Dr. Zaret repeatedly questioned the reliability of Port's report. Dr. Zaret stated that Port did not know what he was doing and that he (Dr. Zaret) would not rely on "anything this man said" (Zaret dep. at 203–08). Dr. Zaret maintained that Port had used the wrong instrument for measuring radio frequency radiation and, furthermore, that Port had not used a reliable methodology for detecting hertzian radiation. Nevertheless, Dr. Zaret stated that, despite the shortcomings of Port's analysis, the fact that the needle went off scale demonstrated that extraordinary levels of radiation were being emitted from the VDTs (Zaret dep. at 208–09). The actual level of radio frequency emissions from the VDTs cannot be determined from Port's survey report (Zaret dep. at 209). While Dr. Zaret stated at his deposition that there is no known minimum threshold of exposure to radiant energy that can cause radiant energy cataracts, he further noted that "there should be a threshold with respect to which cataracts form and that it should vary between people," but that a number of factors would have to be considered (Zaret dep. at 188).[2]

---

1. In June 1979, Sampson had a gynecological examination which revealed the presence of "carcinoma in-situ of the uterine cervix." We gather from Dr. Zaret's deposition that this does not indicate that Sampson had uterine cancer, but had "dysplasia of the S cells." According to Dr. Zaret, dysplasia could turn into cancer (Zaret dep. at 163). Dr. Zaret's testimony and opinions more directly relate to his observations with respect to how radiant energy allegedly caused Sampson's illnesses, rather than actual diagnosis of the carcinoma or the polyps.

2. In a subsequent affidavit attached to Plaintiffs' Response to Motion for Summary Judgment, Dr. Zaret quantified an acceptable level of radiant energy and stated that the figure represented the background level of the sun's radiant energy at its maximum. We consider this statement to be inconsistent with Dr. Zaret's deposition testimony which indicated there is no known minimum threshold of exposure, but that the minimum threshold should vary among people. Plaintiff cannot create a genuine issue of material fact by contradicting Dr. Zaret's

In their complaint, plaintiffs make several allegations sounding in product liability, negligence, and wrongful death against Raytheon and Raytheon Service. Plaintiffs allege that a dangerous level of radiant energy was being emitted from the VDTs manufactured and/or distributed by defendants and that, because of such leakage, they sustained injuries and are entitled to damages. Defendants maintain that the opinion testimony of Dr. Zaret is insufficient to demonstrate the existence of a triable issue of fact concerning the suitability of the Raytheon VDTs and the causation of plaintiffs' injuries. For this reason defendants move for summary judgment.

## DISCUSSION

### A. *Admissibility of Expert Opinion*

Plaintiffs do not dispute that their claims require a finding of fact that the Raytheon VDTs were defective and caused the alleged injuries. The substance of plaintiffs' case rests on Dr. Zaret's expert opinion, both to establish that the VDTs were defective and to prove the causal relationship connecting plaintiffs' illnesses to their use of the VDTs. The admissibility of Dr. Zaret's expert opinion is therefore crucial to plaintiffs' case and to the outcome of defendants' present motion.

■ A person may testify as an expert when 1) the person is "qualified as an expert by knowledge, skill, experience, training, or education" (Fed.R.Evid. 702), 2) the court finds that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" (Fed.R.Evid. 702), and 3) the particular facts or data upon which a person bases an opinion are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" (Fed. R.Evid. 703). Each of these issues regarding an expert's testimony is a matter of law to be determined by the trial judge, *Wallace v. Mulholland,* 957 F.2d 333, 336

(7th Cir.1992), while the decision of whether to credit the expert's testimony is left to the finder of fact. *Ferebee v. Chevron Chemical Company,* 736 F.2d 1529, 1535 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984); *U.S. ex rel. Eckhardt v. Huch,* 1989 WL 97822, 1989 U.S.Dist. Lexis 9435 (N.D.Ill. June 27, 1989).

Defendants do not argue that Dr. Zaret is unqualified to testify as an expert or that his opinions, if admissible, would not assist the trier of fact in understanding the evidence or determining a fact in issue. The first two requirements for admissibility of expert testimony, therefore, are not discussed in this opinion and are considered satisfied for purposes of this motion. The third requirement of expert testimony has been called into question by defendants, however, and that requirement forms the basis of our discussion.

> Federal Rule of Evidence 703 provides:
>
> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Rule 703 liberalizes the admissibility of expert testimony by permitting experts to base their opinions on hearsay and other evidence not admissible in court. The rule is restrictive, however, in that the data relied on must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Thus, expert testimony must be rejected if it lacks an adequate basis.

■ The traditional test governing the admissibility of expert testimony has been whether the expert's theory is generally accepted within the scientific community. *Frye v. United States,* 293 F. 1013

---

earlier statements, at least without a plausible explanation for the change. *Richardson v. Bonds,* 860 F.2d 1427, 1433 (7th Cir.1988). We comment on this *only* to inform the parties of

our position with respect to conflicting statements, but stress that such facts concerning an acceptable threshold level have no bearing on our decision to grant this summary judgment.

(D.C.Cir.1923). In recent years, however, courts have interpreted the "reasonably relied upon" requirement of Rule 703 to require only that the expert's scientific knowledge be based on sound methodology. *Ambrosini v. Labarraque*, 966 F.2d 1464 (D.C.Cir.1992); *U.S. v. Lundy*, 809 F.2d 392, 395 (7th Cir.1987); *Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908, 915 (5th Cir.1987), *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1476, 99 L.Ed.2d 705 (1988); *Ferebee*, 736 F.2d at 1535; *Porter v. Whitehall Laboratories, Inc.*, 791 F.Supp. 1335, 1343 (S.D.Ind.1992). An expert has used sound methodology when he or she has arrived at his or her "causation opinion by relying on methods that other experts in his [or her] field would reasonably rely upon in forming their own, possibly different, opinions." *Osburn*, 825 F.2d at 915. We, too, adopt this methodology-based standard of review.[3]

A methodology-based review is even more necessary when the expert's scientific theory of causation is novel or emerging— as is Dr. Zaret's (Zaret Dep. at 89). Indeed, a new or emerging theory rarely would find immediate wide acceptance in the scientific community. Care must be taken so as not to hinder progressive scientific research or restrict changes in the field of science. *Ambrosini*, 966 F.2d at 1469. Therefore, the expert's *methods*— not his theory—must be examined to ensure that his procedures are of a type reasonably relied upon in the scientific community. Under the methodology-based approach, the procedures employed by the expert cannot diverge significantly from the methods accepted by other experts in the field. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 951 F.2d 1128, 1130 (9th Cir.1991), *cert. granted*, —— U.S. ——, 113

S.Ct. 320, 121 L.Ed.2d 240 (1992); *see also Osburn*, 825 F.2d at 915; *Porter*, 791 F.Supp. at 1343. Thus, the expert's methods must have some scientific support, such as published studies, replication or verification, beyond the testifying expert's own hypothesis. *Porter*, 791 F.Supp. at 1344; *see also Daubert*, 951 F.2d at 1131. "There must be a connection between the currently-observed facts and some known scientific paradigm." *Id.* at 1343. We examine the evidence provided by plaintiffs to determine whether the facts and data supporting Dr. Zaret's opinion are of a type reasonably relied upon by other experts in the field.[4]

■ After scrutinizing Dr. Zaret's deposition and affidavit to find evidence or information about his methodology, we are left with very little. In his affidavit, Dr. Zaret stated that his opinions are based on "specific information concerning measurable levels of exposure to nonionizing radiation" (Zaret aff. ¶ 6). The doctor based his opinion on "firm knowledge that the data of the standards setting committee were fatally flawed" due to the fact that "irradiation levels lower than those permitted by the mother standard were known to produce injury in laboratory animals" (Zaret aff. ¶ 18). He further noted that he based his opinion on his personal knowledge of "many human radiation cases indicating the standards were wrong" and the "fact that the prerequisites for establishing meaningful safety standards, such as, proper laboratory animal research," had not yet been performed (Zaret aff. ¶ 18). The doctor, however, cites no published studies (his or others), scientific data, or other authority upon which he relied in forming his theory.[5] The factors which the

3. Clearly if we applied the *Frye* standard of review, Dr. Zaret's opinions would not be admissible. There is no evidence that his theories or opinions have been accepted generally by the scientific community.

4. Again, we note that we rely only on the facts and/or arguments included in the parties' briefs that meet the requirements of Rule 56—those that are properly supported with a sworn affidavit or included in a deposition. Fed.R.Evid. 56(e). *See also Mid–State Fertilizer Co. v. Ex-*

*change National Bank*, 877 F.2d 1333, 1339 (7th Cir.1989) (stating that Rule 56(e) provides that affidavits supporting and opposing motions for summary judgment must set forth facts and in the case of experts a process of reasoning beginning from a firm foundation).

5. Plaintiffs include what appears to be a reprint of a lecture given by Dr. Zaret from "Proceedings of Conference on Health Hazards of VDUs" (plf. exh. G). This transcript includes four of Dr. Zaret's patient histories and discusses the

doctor stated formed the basis of his opinion do not constitute sound methodology. They are mere observations and conclusory statements.

As evident from our discussion above, the doctor's affidavit and deposition fail to establish sound methodology. Nevertheless, plaintiffs attempt to set out a methodology for the doctor, as a substitute for the doctor's own statements. They state in their brief (p. 4–5):

> [Dr. Zaret] relies upon the radio frequency output measure on the very machines in question and notes the variance between frequency output and the output of the subject machine. He sets forth his opinions on radiant energy, which are based upon his and others observations.... Dr. Zaret relies on the published experiments of others for his reliance on the fact that non-ionizing radiation is detrimental to biological systems.

Plaintiffs state that Dr. Zaret relies upon the "radio frequency output measure on the very machines in question and notes the variance between frequency output and the output of the subject machine." According to Dr. Zaret, and based on the evidence we have been presented with, there was no actual, reliable measurement

of radio frequency emissions from the Raytheon VDTs. Furthermore, there is no evidence that Dr. Zaret ever noted the variance between the frequency output and the output of the VDTs at KLM, or that he relied on any such *measurement* of radio frequency energy emitted by the VDTs.[6] Plaintiffs note that Dr. Zaret based his opinions on "his and others observations." However, plaintiffs neglect to explain what these observations were or whether the data the doctor considered was the type generally relied on by the scientific community.[7] More troublesome yet is plaintiffs' reference to Dr. Zaret's reliance on "published experiments of others." Although reliance on published experiments *may* constitute sound methodology, plaintiffs have not included the studies or experiments, but have included interpretations from magazine articles. More importantly, there is no evidence that the articles are recognized as reliable authority in the field. *See e.g., U.S. v. Vital Health Products, Ltd.,* 786 F.Supp. 761, 771 (E.D.Wisc.1992); *In re Related Asbestos Cases,* 543 F.Supp. 1142, 1149 (N.D.Cal.1982). Again, Dr. Zaret never mentioned that he relied on "published experiments" and made no reference in his deposition or affidavit to the three

doctor's hypothesis that these patients' cataracts resulted from their exposure to VDUs. This brief summary falls short of constituting evidence of a reliable study by Dr. Zaret. The paper is merely a compilation of several patients and includes no indication that it was published or that an actual study was performed. For instance, there is no mention of a control group, of compiled data, or of what procedures were performed.

We also note that Dr. Zaret mentions that his "opinion that the safety standards for hertzian radiation are faulty has recently been confirmed by measurements of traffic control radar exposure that were identified as resulting in cancer during clinical research of Law Enforcement Officers" (Zaret aff. ¶ 5). We assume that the doctor is referring to "Case # 8" mentioned in the reprint attached by plaintiffs but, once again, we are not provided with data or the scientific methods employed by the doctor.

6. Although not necessarily relevant to Dr. Zaret's scientific methodology in forming his opinion, we mention here the doctor's reliance on Port's survey report. Dr. Zaret stated that he relied on Port's survey report in establishing that there were "extraordinarily high levels" of radiation being emitted from the Raytheon

VDTs. Dr. Zaret repeatedly denied the validity of that report and stated over and over that he would not rely on *anything* that Port did. Dr. Zaret stated and plaintiffs argue that even though Port's measurement process was unreliable to establish whether hertzian radiation was being emitted from the VDTs, the report did establish there had been significant emissions because Port had noted that there were "spurious off scale readings." From these readings, the doctor concluded there had been significant radiation emissions from the VDTs. We have a hard time understanding how Dr. Zaret can so emphatically rebut Port's report and then rely on a portion that arguably might support his theory. But, putting this apparent conflict aside and assuming Dr. Zaret was able to determine from Port's notation that extraordinary levels of radiation had been emitted from the VDTs, Dr. Zaret, nevertheless, failed to support this element of his theory with any sound data or facts.

7. Again we stress that in Dr. Zaret's affidavit and deposition he made no reference to others' observations upon which he relied in support of his theory.

articles which plaintiffs attached in support of the doctor's methodology.

Dr. Zaret's general statements that the injuries were caused by radiant emissions are not enough to establish sound methodology. The doctor does not point us to scientific studies, data, or research in support of his theory. Dr. Zaret's opinion that the facts of this case fit his own unsupported, unproven hypothesis does not establish a reliable methodology and, therefore, the testimony is inadmissible. *Porter* 791 F.Supp. at 1344.

B. *The Standards for Summary Judgment Under Rule 56*

The issue of admissibility of an expert's opinion under Rule 703 is separate and distinct from the issue of whether plaintiffs have created a genuine issue of material fact sufficient to withstand a motion for summary judgment under Rule 56. *Mid–State Fertilizer,* 877 F.2d at 1339. Apart from Dr. Zaret's opinion testimony, however, plaintiffs have not put forth evidence to indicate that the VDTs were defective and that they caused Hayes' and Sampson's illnesses. The evidence put forth by plaintiffs is insufficient to withstand a motion for summary judgment and defendants' motion is, therefore, granted.