**Ihor KLEBAN, Plaintiff,**

v.

**S.Y.S. RESTAURANT MANAGEMENT, INC., an Illinois Corporation, International Double Drive–Thru, Inc., an Illinois Corporation, Andrew Sun, John Young, Thomas J. Singer, John D. Terzakis, individually and d/b/a Midwest Properties, James W. Thompson, Jr., individually and d/b/a James Thompson Agency, Joseph Tedesco, individually and d/b/a Tedesco and Associates, John A. Garrity III, Esq., Michael Mullally, St. Louis Double Drive–Thru, Inc., an Illinois Corporation, Willowbrook Restaurant Corporation, an Illinois Corporation, Illinois Petroleum Co. an Illinois corporation, Restaurant Development Corporation, an Illinois corporation, Greenscape Landscaping, Inc., an Illinois corporation, Defendants.**

**No. 95 C 2920.**

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 11, 1998.

**934**

Robert Dreger, Chicago, IL, David Scott Grosky, Law Offices of David S. Grosky, Northbrook, IL, for Plaintiff.

Thomas J. Singer, Mattoon, IL, pro se.

James K. Meguerian, Victoria Hallock, D'Ancona & Pflaum, Chicago, IL, Jeffrey Edward Kehl, Dowd & Dowd, Chicago, IL, David V. Najarian, Najarian & Najarian, Wilmette, IL, John F. Gibbons, Paul P. Biebel, Jr., Robert M. Andalman, Altheimer & Gray, Chicago, IL, John K. Kneafsey, Donald Cahill Shine, Nisen & Elliott, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

The plaintiff, Ihor Kleban, filed suit against the defendant, John Terzakis, alleging violation of the Securities Exchange Act of 1934 ("Rule 10b–5"), 15 U.S.C. § 78j, 17 C.F.R. § 240.10b–5, the Illinois Securities Law of 1953 ("Illinois Securities Law"), 815 ILCS 5/1 *et seq.*, and common law fraud. Mr. Terzakis moves for summary judgment. For the following reasons, the motion is granted.

### Background

Mr. Kleban invested in a limited partnership, Southwest Double Drive–Thru, L.P. ("Southwest Partnership"), which was formed to own and operate Checkers restaurants. Mr. Kleban's investment lost its value and he blames this loss on the fraud of Mr. Terzakis.

In 1990, Thomas Singer formed Chicago Double–Drive Thru, Inc. ("CDDT"), to develop Checkers restaurants in the northern Chicago area. The Southwest Partnership was formed to help facilitate the development of Checkers restaurants. The Southwest Partnership had a General Partner and several limited partners, including Mr. Kleban.

Mr. Kleban began his involvement with Southwest Partnership in November, 1991. Mr. Kleban received a copy of the Southwest Partnership Private Placement Memorandum ("PPM"), which explained the limited partnership offerings and the risks involved in the investment. (Def.App.A). Mr. Kleban first met with Mr. Terzakis during November, 1991. The parties dispute Mr. Terzakis' role in Southwest Partnership. Mr. Terzakis suggests he simply had an agreement with CDDT to locate sites for Checkers restaurants and lease the sites to CDDT. This included obtaining the proper zoning and permits. Mr. Kleban argues that Mr. Terzakis was a principal of Southwest Partnership, an officer of CDDT, and an officer and shareholder of various entities that did business with the Southwest Partnership and CDDT. During the November meeting Mr. Kleban and Mr. Terzakis discussed the construction costs of Checker restaurants. Mr. Kleban sought a specific breakdown of costs

to justify the expected price of $575,000 per restaurant. Mr. Terzakis provided the specifics Mr. Kleban requested. Mr. Kleban admits that Mr. Terzakis did not promise the costs of the Southwest Partnership Checker restaurants would not exceed $575,000. (Kleban Dep. at 134–36).

Mr. Kleban made his first investment in the Southwest Partnership in late November, 1991. He again met with Mr. Terzakis in January, 1992. Mr. Terzakis told Mr. Kleban that "he felt (the Bellwood Checkers restaurant) would do two million based on traffic flow and the density of the population and a lot of other demographics." (Kleban Dep. at 223). Mr. Kleban also states that Mr. Terzakis represented that the limited partners could expect a thirty percent yearly return on their investment. (Kleban Dep. at 223–24). Mr. Terzakis says the thirty percent yearly return was only discussed regarding the Checkers restaurant in Bellwood.

It is undisputed that Mr. Terzakis told Mr. Kleban that there might be additional opportunities for investors to loan funds to CDDT and that a fourth Checkers restaurant to be located at a busy intersection in Elmhurst was being negotiated. (Kleban Dep. at 224). Mr. Terzakis also informed Mr. Kleban that he was working with the Illinois Department of Transportation to get driveways for the Oak Lawn Checkers to conform to the PPM. Mr. Terzakis told Mr. Kleban that he expected the Bellwood Checkers to cost $575,000 and that restaurant costs were under control. Mr. Terzakis did not inform Mr. Kleban that he had received a one-time property management fee of one hundred dollars for services rendered at possible restaurant sites.

On February 1, 1992, Mr. Kleban invested an additional $150,000 in Southwest Partnership. Mr. Kleban also invested funds in Southwest Partnership in May, 1992, and August, 1992. In July, 1992, Mr. Kleban loaned $200,000 to CDDT. In September, 1993, Mr. Kleban renewed the $200,000 loan and extended an additional $100,000 loan to CDDT. Ultimately, a proposed buyout by Checkers of the restaurants allocated to the Southwest Partnership failed and the investment lost money. This suit followed.

## Motions to Strike

Mr. Kleban filed a motion to strike all or portions of Mr. Terzakis' Local Rule 12(M) Statement. Mr. Kleban argues that all of Mr. Terzakis' Rule 12(M) paragraphs that are not cited in Mr. Terzakis' summary judgment brief are necessarily irrelevant and must be stricken. A requirement that each Rule 12(M) paragraph be cited in a summary judgment brief is not found in the text of Local Rule 12(M) and Mr. Kleban has not cited any law that indicates such a requirement exists. To the extent portions of Mr. Terzakis' Rule 12(M) statement are irrelevant, they have been disregarded by the court.

Mr. Kleban also argues that five of Mr. Terzakis' Rule 12(M) paragraphs and three of his appendices contain inadmissible hearsay. Mr. Terzakis has withdrawn the five paragraphs and two of the appendices Mr. Kleban found objectionable. The remaining appendix, "I," consists of two letters and a fax cover sheet. They are offered for the truth of the matter asserted and Mr. Terzakis has not argued that they fall within an exception to the hearsay rule. Only evidence admissible at trial may be considered in a summary judgment proceeding. *Whitted v. General Motors Corp.*, 58 F.3d 1200, 1204 (7th Cir.1995). Thus, appendix I is stricken.

Mr. Kleban also argues that certain Rule 12(M) paragraphs contain material that are unsupported by the personal knowledge of the declarant. Having read the disputed paragraphs and underlying support, only paragraph 63 is deficient. Jennifer LaSota's affidavit does not indicate she knew of all of Mr. Terzakis' business entities and thus, she does not have the proper foundation to testify regarding whether "any" of Mr. Terzakis' entities provided construction goods or services to the Southwest Partnership. The other cited materials do not support paragraph 63 either.

Mr. Kleban objects to certain of Mr. Terzakis' Rule 12(M) paragraphs as containing inadmissible opinion testimony. Some of Mr. Terzakis' Rule 12(M) paragraphs contain unnecessary adjectives and adverbs that indicate opinion. Accordingly, the word

"wealthy" is stricken from paragraph 12, the phrase "thinly capitalized" is stricken from paragraph 26, the sentence stating "[t]here is no evidence that the proceeds of the loans were used for any improper purposes," is stricken from paragraph 41 as argumentative, the word "accurately" is stricken from paragraph 68, paragraph 74 is stricken as unsupported by the cited materials and as improper opinion, and the word "proper" is stricken from paragraph 114.

Finally, Mr. Kleban argues that any reference to a memo written from Mr. Kleban to his former counsel, John Galarnyk, should be stricken as violating the attorney-client privilege. The memo was written to Mr. Galarnyk to introduce him to Mr. Kleban's dealings and investments in Checkers restaurants and the Southwest Partnership. The memo was turned over to Mr. Terzakis during discovery and was used at Mr. Kleban's deposition. The attorney-client privilege was not raised until Mr. Kleban's response to summary judgment. Mr. Kleban has presented no evidence that the disclosure of the document was inadvertent. *See Harmony Gold U.S.A., Inc. v. FASA Corp.*, 169 F.R.D. 113, 116 (N.D.Ill.1996) ("The party claiming inadvertent disclosure has the burden of proving that the disclosure was truly inadvertent."). Additionally, Mr. Kleban did not object to the use of the memo during his deposition, at which time he undisputably became aware the document had been produced to Mr. Terzakis. Further, Mr. Terzakis has relied on the document in his summary judgment motion. It is simply too late in the day to claim the attorney-client privilege for Mr. Kleban's memo.[1]

### Federal Securities Claims

To establish liability under Rule 10b–5, Mr. Kleban must demonstrate that Mr. Terzakis:

(1) made an untrue statement of material fact or omitted a material fact that rendered the statements made misleading,

(2) in connection with a securities transaction, (3) with the intent to mislead, and (4) which caused [Mr. Kleban's] loss.

*Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir.1989). On a motion for summary judgment, the evidence and all reasonable inferences must be viewed in the light most favorable to Mr. Kleban.

### A. May, 1992 Investment

Mr. Terzakis argues that the only statement Mr. Kleban relied on to make the May, 1992 investment was his comment that he "felt [the Bellwood Checkers restaurant] would do two million based on traffic flow and the density of the population and a lot of other demographics." At his deposition Mr. Kleban admitted he relied on Mr. Terzakis' profit projection in making the May, 1992 investment. Mr. Kleban did not specifically state that was the *only* statement that influenced his investment decision. It was the only statement Mr. Kleban could recollect at the time of the deposition. However, in response to Mr. Terzakis' motion for summary judgment, Mr. Kleban argues that his investment decision was also based on Mr. Terzakis' representations in the November, 1991, and January, 1992 meetings. Mr. Kleban also argues Mr. Terzakis omitted to mention material facts in their discussions which, if known, would have influenced his decision to invest. Mr. Kleban could not have testified at his deposition about facts he was never told by Mr. Terzakis. Accordingly, Mr. Terzakis' alleged misstatements, as well as omissions, at the November, 1991, and January, 1992, meetings will each be addressed in determining liability for the May, 1992, August, 1992, and September, 1993 investments.

---

1. In a reply to Mr. Kleban's Rule 12(N) statement, Mr. Terzakis objects to Mr. Kleban's use of the affidavits of Andrew Davare, John Nastav, and Joseph Scard. Mr. Terzakis claims he continually requested these affidavits during discovery, but they were never disclosed. Mr. Terzakis did not file a motion seeking to strike the affidavits and Mr. Kleban had no opportunity to file a response. The objection will therefore not be considered. In reviewing Mr. Kleban's Rule 12(N) response, however, it is evident that many of the paragraphs are not supported by the cited material or are statements made by individuals without firsthand knowledge of the facts alleged. Accordingly, paragraphs 2, 4, 5, 6, 8, 22, 34, 39, 41, 42, 46, and 47 are stricken.

## 1. *November, 1991 Meeting*

Mr. Kleban testified that Mr. Terzakis told him during the November, 1991 meeting that the cost of the Checkers restaurants should be $575,000. (Kleban Dep. at 134). Mr. Kleban also testified, however, that Mr. Terzakis did not guarantee the price for each restaurant would not exceed $575,000. (Kleban Dep. at 235–36). Taken together, these comments do not indicate an "untrue statement" was made.

While Mr. Kleban has presented no evidence that Mr. Terzakis made any untrue statement of material fact in the November, 1991 meeting, he argues Mr. Terzakis omitted material facts. Mr. Kleban argues that Mr. Terzakis was an officer of CDDT with day to day duties, was developing restaurants for CDDT, and that there was a "crossover" in officers between Mr. Terzakis' entities and those owned by Mr. Singer. (Rule 12(N) ¶¶ 9–12). According to Mr. Kleban, these facts were not made known to him during the November, 1991 meeting.

In implementing the Securities Exchange Act of 1934, the Code of Federal Regulations defines an officer as "a president, vice president, secretary, treasury or principal financial officer, comptroller or principal accounting officer, and any person routinely performing corresponding functions with respect to any organization whether incorporated or unincorporated." 17 C.F.R. § 240.3b–2. To prove Mr. Terzakis was an officer of CDDT, Mr. Kleban presents letters written by Mr. Terzakis on behalf of CDDT. (Pl.App. J & K). These letters deal with restaurant site locations and parking availability. Mr. Kleban testified that, even before meeting Mr. Terzakis, he was aware that CDDT had an exclusive agreement with Mr. Terzakis that permitted Mr. Terzakis to acquire property for restaurant sites and lease it back to CDDT. (Kleban Dep. at 18). These letters are consistent with that agreement. The letters, however, indicate Mr. Terzakis' business relationship and involvement with CDDT was not clearly defined. Both letters are signed by Mr. Terzakis on behalf of CDDT. Each letter contains language requesting that the recipients do business with "us," indicating Mr. Terzakis was not acting on behalf of his own entities, but was representing CDDT directly. Further, in the letter regarding the parking spaces, Mr. Terzakis writes to Heritage Bank that he "know[s] that *our* company, on a minimum basis, would be willing to commit in excess of Three Million Dollars [sic] a year in deposits as well as to make an effort in the future to bank with your group as our stores open in the vicinity of Heritage Banks." (Pl.App.K) (emphasis added). Mr. Terzakis' representations regarding CDDT's financial situation indicates an intimate involvement in the running of CDDT and the ability to make important financial decisions on behalf of the company. Further, a letter written by CDDT's lawyer to the vice president of franchising for Checkers notes that should Mr. Singer die or resign, the new president of CDDT "would be qualified for that position," and might likely be Mr. Terzakis. (Pl.App. R at C05976). Additionally, Mr. Terzakis' business card had a CDDT logo and he regularly reported at CDDT's "Senior Staff Meeting[s]." (Pl.App. U & V). In sum, there is a genuine issue of fact as to whether Mr. Terzakis was an officer of CDDT.

Determining that Mr. Terzakis might be an officer of CDDT does not end the Rule 10b–5 inquiry regarding the omission of this statement. "The express language of [Rule] 10b–5 only proscribes omissions that render affirmative statements misleading...." *Schlifke*, 866 F.2d at 944. Thus, Mr. Kleban must demonstrate that his being unaware Mr. Terzakis was an officer of CDDT rendered an affirmative statement by Mr. Terzakis materially misleading. Mr. Kleban has not pointed to any statement made by Mr. Terzakis that was misleading due to Mr. Kleban's ignorance of Mr. Terzakis' role as a CDDT officer. Thus, even if Mr. Terzakis was an officer of CDDT, Mr. Kleban's lack of knowledge regarding Mr. Terzakis' position does not result in a Rule 10b–5 violation.

Mr. Kleban also claims Mr. Terzakis was "developing" restaurants for CDDT. For this proposition Mr. Kleban cites the same letters that indicate Mr. Terzakis might have been an officer. (Pl.App. J & K). These letters only indicate that Mr. Terzakis was

attempting to locate restaurant sites and parking spaces for CDDT. Mr. Kleban was aware of Mr. Terzakis' role in acquiring property and leasing it to CDDT. Thus, to the extent Mr. Terzakis was "developing" restaurants, Mr. Kleban was aware of Mr. Terzakis' role and no omission occurred.

Finally, Mr. Kleban's cited materials do not indicate that there was a cross-over of officers between entities owned by Mr. Terzakis and entities owned by Mr. Singer. For this proposition Mr. Kleban only cites the letter written by CDDT's lawyer to the vice president of franchising for Checkers. (Pl. App.R). This letter does not indicate a cross-over of officers.

### 2. January, 1992 meeting

Mr. Kleban also met with Mr. Terzakis in January, 1992. According to Mr. Kleban, during this meeting Mr. Terzakis told him that: (1) John Nastav was a "big investor" that was going to invest in five restaurants, (2) he felt the Bellwood Checkers would do $2 million in business based on a variety of factors, (3) the limited partners could expect a 30% return on their investments, (4) the limited partners and the general partner would each contribute half the funding for the construction of the restaurants, (5) there might be additional opportunities for investors to loan funds to CDDT, (6) a fourth Checkers restaurant at a busy intersection in Elmhurst was being negotiated, (7) if Mr. Kleban and his brother-in-law, Andrew Davare, made further investments and Mr. Terzakis acquired the Elmhurst site, the Elmhurst site would be assigned to the Southwest Partnership, (8) work was being done with the Illinois Department of Transportation to get driveways for the Oak Lawn restaurant to conform to the PPM, (9) the expected cost of the Bellwood Checkers would be $575,000, (10) the cost of the first restaurant would be less than $575,000, (11) restaurant costs were under control, (12) the proposed Elmhurst restaurant would bring in between $2 million and $2.5 million in revenues per year, and (13) CDDT would be responsible for cost overruns. Each statement will be considered to determine if it could lead to a Rule 10b–5 violation.

John Nastav was an investor in Checkers restaurants in Chicago and St. Louis. (Nastav Aff. ¶¶ 1–2). Whether he was a "big" investor is a subjective determination. According to Mr. Nastav, he had numerous investments in Checkers, including general partnerships, limited partnerships, and loans. Id. At most, Mr. Kleban's statement is puffery. "Mere sales puffery is not actionable under Rule 10b–5." Eisenstadt v. Centel Corp., 113 F.3d 738, 746 (7th Cir.1997) (citations omitted).

Mr. Terzakis told Mr. Kleban "he felt [the Bellwood Checkers restaurant] would do two million based on traffic flow and the density of the population and a lot of other demographics." (Kleban Dep. at 223). "[P]redictions and forecasts which are not of the type subject to objective verification are rarely actionable under § 10(b) and Rule 10b–5." Searls v. Glasser, 64 F.3d 1061, 1066 (7th Cir.1995) (citation omitted). "Therefore, as long as those statements had a reasonable basis when made, they do not constitute fraud." Id. "[T]he burden of persuasion concerning 'reasonable basis' ... rests with the plaintiff." Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 513 (7th Cir.1989). Mr. Kleban has offered no evidence that indicates Mr. Terzakis' prediction was unreasonable when made. Indeed, first year sales at the Bellwood store were between $1.6 million and $1.8 million. Accordingly, Mr. Terzakis' prediction is not actionable.

According to Mr. Kleban, Mr. Terzakis stated that the limited partners could expect a thirty percent return on their investment in Checkers restaurants. (Kleban Dep. at 223–24). As above, the issue is whether Mr. Terzakis had a reasonable basis for this prediction. Mr. Kleban has presented no evidence that this was not a reasonable prediction in January, 1992. Additionally, the PPM contained financial forecasts for the Oak Lawn Checkers. (Def.App. A at A–1). Mr. Kleban had been given a copy of the PPM and should have been able to assess the legitimacy of Mr. Terzakis' prediction. "Projections which turn out to be inaccurate are not fraudulent simply because later events

show that a different projection would have been more reasonable." *Grassi v. Information Resources, Inc.,* 63 F.3d 596, 599 (7th Cir.1995).

Mr. Kleban argues that Mr. Terzakis represented that the general partners would contribute half of the funding for the restaurants. Mr. Kleban's testimony does not indicate Mr. Terzakis ever told him the general partners would contribute half of the funding. (Kleban Dep. at 225). Further, Mr. Nastav stated in his affidavit that Mr. Singer, not Mr. Terzakis, spoke in the January meeting regarding the general partners' contribution. (Nastav Aff. ¶ 4). Mr. Davare, who was also present at the January meeting, simply states that Mr. Terzakis and Mr. Singer went over the partnership structuring. (Davare ¶ 6).

Assuming that Mr. Terzakis made the alleged comment, it is directly contradicted by the PPM. In more than one location the PPM indicates the general partner's contribution will consist of between one and four franchise agreements as well as $90.00 in cash. (Pl. App. A at 6, 71, B–4). Additionally, the PPM indicates that any funding not provided by the limited partners will be generated from loans to Southwest Partnership which would encumber the Partnership's assets. (Pl.App. A at 22–23, 47). As the Seventh Circuit has noted, "[i]f a literate, competent adult is given a document that in readable and comprehensible prose says X (X might be, 'this is a risky investment'), and the person who hands it to him tells him, orally not-X ('this is a safe investment'), our literate, competent adult cannot maintain an action for fraud against the issuer of the document." *Carr v. CIGNA Securities, Inc.,* 95 F.3d 544, 547 (7th Cir. 1996) (citations omitted). Thus, even if Mr. Terzakis made the alleged comment, it is not actionable.

Mr. Terzakis also told Mr. Kleban that there might be additional opportunities to loan money to CDDT and that negotiations were occurring for a fourth restaurant at a busy intersection in Elmhurst. Mr. Kleban has not presented any evidence that either of these statements was false.

According to Mr. Kleban, Mr. Terzakis also stated that if Mr. Kleban and Mr. Da-vare invested further funds in the Southwest Partnership and Mr. Terzakis acquired the Elmhurst site, the site would be assigned to the Southwest Partnership. (Kleban Dep. at 224). Later in his deposition, however, Mr. Kleban more specifically testified that Mr. Terzakis stated that if Mr. Kleban and Mr. Davare invested "he would consider recommending the [Elmhurst] site to CDDT being part of [the] partnership." (Kleban Dep. at 237). Mr. Kleban's more specific testimony is consistent with Mr. Terzakis' role with CDDT: Mr. Terzakis located restaurant sites and CDDT assigned the sites to different partnerships. (Garrity Dep. at 69–73). Thus, Mr. Terzakis' promise to recommend was not a false statement.

Mr. Terzakis also informed Mr. Kleban he was working with the Illinois Department of Transportation to get driveways for the Oak Lawn restaurant to conform to the PPM. Mr. Kleban, however, admits that this statement was true. (Kleban Dep. at 232).

Mr. Kleban testified Mr. Terzakis made a variety of misleading statements regarding the actual cost of construction of the restaurants. Mr. Kleban states he was told that the expected cost of the Bellwood Checkers would be $575,000, that the cost of the first restaurant would be less than $575,000, and that restaurant costs were under control. (Kleban Dep. at 233, 236). Mr. Terzakis argues that he believed these statements when he made them. Mr. Kleban counters by arguing that the vice president of construction, Mike Pizzuto, wrote a letter to Joe Tedesco, CDDT's chief financial officer, indicating costs for the restaurants were higher than expected. (Kleban Dep. at 234). Mr. Kleban, however, has not presented evidence that Mr. Terzakis saw the letter, nor any admissible evidence that the letter existed. Further, Mr. Kleban admitted Mr. Terzakis, in the November, 1991 meeting, made no promises that the costs of the restaurants would actually be $575,000. (Kleban Dep. at 235–36). The PPM, while not directly contradictory, also states that start-up costs for fully equipped Checkers restaurants will be "approximately $575,000," and that "[t]he actual cost of each restaurant may vary." (Pl. App. A at 20).

Mr. Kleban argues that Jennifer LaSota, an employee of CDDT who coordinated the construction of Checkers restaurants, also worked for Mr. Terzakis and thus, Mr. Terzakis must have known restaurants costs were not under control. Ms. LaSota, however, has presented an affidavit stating she kept her work for CDDT separate from her work for Mr. Terzakis and that the only regular contact she had with Mr. Terzakis was to inform him when the contractor was breaking ground at each Checkers site. (LaSota aff. ¶¶ 3,5). As noted above, however, Mr. Terzakis appears to have gained intimate knowledge of the financial operations of CDDT and regularly reported at CDDT senior staff meetings, indicating he was kept apprised of CDDT's financial situation. Given the totality of the evidence, a reasonable fact finder could conclude Mr. Terzakis knew the facts regarding restaurant costs.

Nevertheless, Mr. Kleban's argument suffers from a more serious problem. Nowhere in his Rule 12(N) statement does he present the slightest evidence that restaurant costs exceeded the $575,000 estimate in material degree. In his response to Mr. Terzakis' motion, Mr. Kleban states only that his deposition testimony "rebuts" the premise that statements were not material and that for me to conclude otherwise would be "reversible error." (Pl. Memorandum at 14). A court cannot be expected to comb the record, including unspecified pages of a deposition, to find statements that the court might find material. *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir.1995). This is particularly true where, as here, a party fails to even identify the facts from which the court might draw an inference of materiality.

Next, Mr. Kleban complains that Mr. Terzakis falsely represented that the Elmhurst Checkers would generate between $2 million and $2.5 million in revenue per year. As above, Mr. Kleban has presented no evidence that this was an unreasonable prediction when it was made and thus, the statement is not actionable under 10b–5.

Mr. Kleban also argues that Mr. Terzakis told him that CDDT was responsible for cost overruns. Notably, Mr. Kleban testified it was Mr. Singer who told him CDDT would be responsible for cost overruns. (Kleban Dep. at 121). Now, at summary judgment, Mr. Kleban presents the affidavit of Mr. Nastav to argue that it was Mr. Terzakis who made the allegedly false statement. (Nastav Aff. ¶ 4). Regardless of this inconsistency, the comment is directly contradicted by the PPM. Under the heading "Risk Factors" and the sub-heading "Construction Risks," the PPM notes that "[t]he costs of construction may exceed the amount budgeted or there may be cost overruns that exceed the General Partner's allotment for contingencies which would make it necessary for the General Partner to *seek additional financing*." (Pl.App. A at 35) (emphasis added). Oral representations which are directly contradictory to the PPM are not actionable. *Carr*, 95 F.3d at 547.

■ Mr. Kleban also argues Mr. Terzakis omitted material facts during the January, 1992 meeting. According to Mr. Kleban, Mr. Terzakis did not state that CDDT was to become the general partner of the Southwest Partnership and all other limited partnerships developing Checkers restaurants. The only evidence Mr. Kleban presents on this point are letters indicating CDDT was to become the general partner of Southwest Partnership and a certificate of amendment. (Pl.App.L, O.¶ ). The one letter that indicates it was sent to Mr. Terzakis is dated July 21, 1992, five months after the January meeting. (Pl.App.O). Mr. Kleban presents no argument that the omission was material. Also, as noted above, Mr. Kleban must point to an affirmative statement that was misleading due to Mr. Terzakis' alleged omission. *Schlifke*, 866 F.2d at 944. Mr. Kleban has not cited any other statement by Mr. Terzakis that was misleading due to the alleged omission. For all of these reasons, this omission is not actionable.

■ Mr. Kleban alleges Mr. Terzakis did not disclose he was drawing management fees for services rendered at various restaurant cites. Mr. Terzakis admits this disclosure was not made, but notes the one-time management fee only amounted to one hundred dollars. Again, Mr. Kleban has not indicated how this omission is material or what affirmative statement was misleading

due to the omission. "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). There is no evidence that Mr. Terzakis' receipt of a one-time hundred dollar management fee would have significantly altered the mix of information available to Mr. Kleban.

Mr. Kleban also alleges Mr. Terzakis did not inform him that Mr. Terzakis was buying property that would later be developed as Checkers restaurants for the Southwest Partnership and CDDT. This argument, however, is directly contradicted by Mr. Kleban's deposition testimony indicating Mr. Singer informed him that there was already an exclusive agreement with Mr. Terzakis to purchase land and lease it back to CDDT. (Kleban Dep. at 18). Further, Mr. Kleban admits that in the November, 1991 meeting with Mr. Terzakis he discussed the possibility of getting involved in the purchase and lease-back of land. *Id.* This alleged omission is not actionable.

Mr. Kleban also suggest that Mr. Terzakis did not inform him that he had consented to CDDT's assignment of its leasehold interest in the Oak Lawn Checkers to United Capital Leasing in exchange for an equipment lease. Again, Mr. Kleban offers no argument that such an omission was material. Mr. Kleban may not simply proffer omissions and expect to proceed without presenting some evidence or argument that the omission would have significantly altered the information available to him. The court is left guessing at what relevance Mr. Terzakis' omission had to Mr. Kleban's decision to invest. Further, the PPM states that Southwest Partnership anticipated taking loans that would encumber the Partnership's leasehold interest. (Pl. App. A at 22). Thus, Mr. Kleban should already have been aware of the omitted information. Additionally, Mr. Kleban has not pointed to any statement that was misleading due to this omission.

The statements and omissions discussed above are the only ones supported by Mr. Kleban's evidence. None of these statements or omissions are actionable under Rule 10b–5. Accordingly, summary judgment is granted for Mr. Terzakis on Mr. Kleban's May, 1992 investment.

### B. August, 1992 Investment

Although Mr. Kleban never testified to meeting Mr. Terzakis in June, 1992, Mr. Kleban has presented the affidavit of Joseph Scard, stating he met with Mr. Terzakis and Mr. Kleban in June, 1992. Mr. Scard states that Mr. Terzakis represented that he and Mr. Singer were seeking $30 million dollars in funding to develop Checkers restaurants. Mr. Kleban presents no evidence that this statement was untrue or material. This is the only new statement Mr. Kleban alleges was made, and is supported by evidence, between the May, 1992, investment and the August, 1992, investment. Since it is insufficient to maintain a 10b–5 action, Mr. Kleban's August, 1992 investment claim does not survive summary judgment.

### C. September, 1993 Investment

Mr. Kleban has not presented any statements or omission from Mr. Terzakis between August, 1992 and September, 1993, that influenced his September, 1993 investment. Accordingly, Mr. Kleban's September, 1993 investment claim does not survive summary judgment.[2]

### Conclusion

After considering the evidence submitted in opposition to the motion for summary judgment, I conclude that summary judgment should be granted as to all of Mr.

---

2. Mr. Kleban also brought a claim under the Illinois Securities Law of 1953 and a claim for common law fraud. "[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendant state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir.1994). Since Mr. Kleban's Rule 10b–5 claim is no longer part of this case, I do not have jurisdiction over his state law claims. Accordingly, they are dismissed from this suit.

Terzakis' alleged misrepresentations and omissions.